

**IN THE MATTER OF PROCEEDINGS IN THE UNITED STATES DISTRICT COURT IN THE EASTERN DISTRICT OF VIRGINIA ALEXANDRIA DIVISION BETWEEN**

**CHARLOTTE CHARLES, TIM DUNN AND NIALL DUNN**　　　　(Plaintiffs)

**and**

**ANNE SACOOLAS and JONATHAN SACOOLAS**　　　　(Defendants)

**EXPERT OPINION ON ENGLISH LAW**

**BY HOWARD PALMER Q.C.**

1.　I am a barrister of the English Bar and Queen's Counsel. I was called to the Bar in 1977 and awarded the title of Queen's Counsel in 1999. During the entirety of my career I have practised from a set of chambers situated at 2, Temple Gardens, London EC4Y 9AY. As such, I am an independent practitioner. There is no partnership between me and any other member of those chambers. I am also independent of the lawyers involved in instructing me in this matter, namely Messrs. Langleys of Queens House, Micklegate, York YO1 6WG, a firm of solicitors which itself takes instructions from John D. McGavin and Anna G. Zick of Bancroft, McGavin, Horvath & Judkins, of 9990 Fairfax Boulevard, Suite 400, Fairfax, Virginia 22030.

2.　I have been asked to prepare this Opinion on English Law[1] in the form of a declaration or statement, and understand that it may be presented to the above captioned court. Insofar as I declare that the facts in this Opinion are true, I am referring to such facts as are within my own knowledge and also to the fact that I honestly hold the opinions put forward herein. Other facts put forward are facts or assumptions derived from my instructions and documents I have considered in relation to the case. I declare under

---

[1]　Technically, both in terms of the jurisdiction of the Courts and in terms of the applicable law, I should refer to the "Courts of England and Wales" and the "Law of England and Wales", since the jurisdiction and law of those two countries are entirely unified. I shall however use the shorthand of "English law" and "English Jurisdiction" for convenience. Other countries within the United Kingdom, such as Scotland and Northern Ireland, have their own separate laws and jurisdiction.

EXHIBIT

tabbies®

1



penalty of perjury under the laws of the United States of America that the facts and opinions contained herein are true and correct to the best of my knowledge and belief.

**Introduction**

3. I have been instructed by Huw Edwards, a solicitor and partner in the firm of Langleys to prepare an opinion on English law in the context of the Defendants' Motion to Dismiss the Plaintiffs' claims in the above captioned litigation. It is as I understand it common ground between the parties in the case that English substantive law is applicable to all substantive issues to be decided in the litigation[2]. I am therefore asked to prepare this opinion on the English law which applies to the issues which arise in the circumstances of this case.

4. The Opinion is independent of the interests of the parties and is intended to assist the Court which is adjudicating between the parties.

5. This Opinion is sought to serve a variety of different purposes – first, to show what English Law provides in certain factual scenarios, so as to identify what the parties' legal rights and obligations are in a given situation. Second, to identify any difficulties which might arise for a foreign court in the determination and application of English law (as the 'applicable foreign law'), where the content of such law has to be proved by evidence rather than simply by legal argument. And finally to comment on procedure in the English courts if proceedings were to be brought and prosecuted in England rather than in the USA.

**Qualifications and Experience**

6. As mentioned above I am a barrister in 2 Temple Gardens, where I have practised continuously for 42 years. Having taken a degree in Law at Oxford University (1973 to 1976) I studied for the Bar of England and Wales at the College of Law from 1976 to 1977. For a year from 1977 I was a lecturer in law at King's College, London (part of London University), where I taught contract and tort law. At the same time I completed a practical qualification for the Bar (known as pupillage) at 2 Temple Gardens. During

---

[2]   Memorandum in support of Motion to Dismiss ("MMTD") p. 2; Opposition to MTD ("OMTD") p. 2, 19, 20

the entirety of my career I have practised from this set of Barristers' chambers. I was appointed a Queen's Counsel in 1999. This is a qualification (then awarded by the Lord Chancellor's Department) based on an assessment of excellence, for which application had to be made. At the time, roughly 15% of applicants were successful. I have been a Recorder of the Crown Court since 2006. This is a temporary judicial appointment to hear criminal trials before a jury in the Crown Court, and I sit as a Recorder for around 3 working weeks per annum.

7.   My practice at the Bar has concentrated almost exclusively on civil litigation in a wide range of fields including personal injury (and fatal accidents), insurance (especially motor insurance), conflicts of laws, construction litigation and professional negligence. I have considerable specialist expertise in all these areas, including having appeared, or having been instructed to appear, in the Court of Appeal and the House of Lords (now the Supreme Court) in all the above fields.

**Professional duty as Expert**

8.   I am fully familiar with Part 35 and Practice Direction 35PD to the English Civil Procedure Rules 1998 with regard to the duties of an expert instructed to give opinion evidence in legal proceedings, which provides (in summary):

(1)   That the Expert has a duty to assist the Court in its deliberations, which overrides the duty owed as a matter of contract to assist his client (CPR Pt. 35.3);

(2)   That the Expert must state the substance of all material instructions on the basis of which the report is written (CPR Pt. 35.10(3));

(3)   That the Expert's report must comply with the Practice Direction annexed to CPR Pt. 35, and state as much (CPR Pt. 35.10(1), (2)); the relevant content of the Practice Direction is as follows:

a) 2.1: Expert evidence should be the independent product of the expert uninfluenced by the pressures of litigation.

b) 2.2: Experts should assist the court by providing objective, unbiased opinions on matters within their expertise, and should not assume the role of an advocate.

c) 2.3: Experts should consider all material facts, including those which might detract from their opinions.

3

d) 2.4: Experts should make it clear—

    (i)    when a question or issue falls outside their expertise; and

    (ii)   when they are not able to reach a definite opinion, for example because they have insufficient information.

e) 2.5: If, after producing a report, an expert's view changes on any material matter, such change of view should be communicated to all the parties without delay, and when appropriate to the court.

f) 3.1: An expert's report should be addressed to the court and not to the party from whom the expert has received instructions.

g) 3.2: An expert's report must—

    (i)    give details of the expert's qualifications;

    (ii)   give details of any literature or other material which has been relied on in making the report;

    (iii)  contain a statement setting out the substance of all facts and instructions which are material to the opinions expressed in the report or upon which those opinions are based;

    (iv)  make clear which of the facts stated in the report are within the expert's own knowledge;

    (v)   [not relevant]

    (vi)  where there is a range of opinion on the matters dealt with in the report

        A. summarise the range of opinions; and

        B. give reasons for the expert's own opinion;

    (vii) contain a summary of the conclusions reached;

    (viii) if the expert is not able to give an opinion without qualification, state the qualification; and

    (ix)  contain a statement that the expert—

        A. understands their duty to the court, and has complied with that duty; and

        B. is aware of the requirements of Part 35, this practice direction and the Guidance for the Instruction of Experts in Civil Claims 2014



9.   I have prepared this Opinion in accordance with the spirit and on the basis of the above directions. I have in the past presented Opinions on English law to the courts of Indiana, New Zealand, Italy and Spain.

## Summary of the Facts (Proved or Assumed)

10.   On 27 August 2019 a fatal accident occurred in Northamptonshire, England when a Volvo motor car allegedly owned by the Second Defendant and driven by the First Defendant collided with a motorcycle ridden by Harry Dunn, aged 19 ("the deceased"), the son of the Charlotte Charles and Tim Dunn (whom I shall refer to as the First and Second Plaintiffs, respectively) and the brother of Niall Dunn (whom I shall refer to as the Third Plaintiff).

11.   The deceased survived for a significant period of time after the accident but died later the same day in hospital.

12.   The First and Second Plaintiffs also act on behalf of the Estate of the deceased.

13.   The accident was caused by the negligence of the First Defendant. I understand, from the recent withdrawal of Claim IV in the Complaint, that it is conceded that the accident was not caused by any negligence on the part of the Second Defendant, but it is maintained that the Second Defendant is vicariously liable for the negligence of the First Defendant (an issue which I deal with below).

14.   The Plaintiffs have commenced proceedings by issuing a Complaint in a District Court in The Eastern District of the state of Virginia, Alexandria Division against the Defendants. The Defendants have issued a Motion to Dismiss the Complaint on grounds which include a plea of *forum non conveniens* – a concept with which I am familiar in English law.

## Documents seen

I have seen the following documents:

(1)   The Plaintiffs' Complaint;

(2)   The Defendants' Memorandum in support of Motion to Dismiss ("MMTD");



    (3)    Declarations by Anne and Jonathan Sacoolas, each dated 29 October 2020

    (4)    The Plaintiffs' Opposition to Defendants' Motion to Dismiss ("OMTD"), with its Exhibits (including, at Exhibit 1, a Declaration by Catherine Foster, a Barrister practising in England). I have not considered in any detail Exhibits 7 to 13 which do not seem to raise any question of English law.

**Instructions**

15.    I have been asked to set out my opinion on English substantive (and where appropriate, procedural) law concerning the following topics or questions:

    (1)    The impact of English Law and procedure on the question whether England and the English Courts provide "a proper … venue [which is] available and adequate" for the resolution of the Plaintiffs' claims

    (2)    Whether service of proceedings issued in England, upon a nominated representative of the Defendants in England, is sufficient and effective to bring the Defendants within the jurisdiction of the Courts of England;

    (3)    Whether the Courts of England would in any event exercise jurisdiction over the Defendants in the circumstances of this case, whether the Defendants submitted to be sued in England or not;

    (4)    How a 'Quantum only' Trial would be likely to progress and what witness evidence could be anticipated:

    (5)    Whether the Plaintiffs have a direct right of action against the Defendants' Motor Insurers, regardless of whether the Plaintiffs are able to, or wish to, sue the Defendants personally in England; and whether there is any advantage to the Plaintiffs in choosing to sue the Defendants personally rather than the Insurers;

    (6)    Whether the fact that the Defendants have no assets within the jurisdiction of England and Wales represents a disadvantage to the Plaintiffs in terms of enforcement of any judgment obtained against the Defendants (if sued alone or in conjunction with the Insurers);

    (7)    The circumstances in which the owner of a vehicle can be held vicariously liable for the tortious conduct (negligence) of the driver of the vehicle whilst in the course of driving the vehicle;



(8)    Whether an award for "Loss of Intangible Benefits" is available in law to the Plaintiffs under the provisions of the Fatal Accidents Act 1976; if so, what is the nature of that award.

## Opinion

16.    **Is England a proper venue, available and adequate? Is Service on a nominated representative in England sufficient to make service effective to bring the Defendants within the jurisdiction of the Courts of England?**

I note that the Defendants have agreed to be sued in England by authorising counsel in England to accept service on their behalf (MMTD p. 5/21). From the contents of the Sacoolases' declarations I take it that 'counsel' refers to a firm of lawyers on behalf of the Defendants (identified as Arnold & Porter in the declarations, solicitors of 25 Old Broad Street London EC2N 1HQ). The procedure for commencement of proceedings in English Courts is laid down by the Civil Procedure Rules 1998 ("CPR") first of all to issue a Claim Form – this is a purely administrative act done by the Court on request of the Claimant (i.e. Plaintiff in US terminology). If the Claimants consider that the value of their claims for personal injury or death exceed £50,000 the Claim Form can be issued in the High Court of Justice (paragraph 3.6 of Practice Direction 7A of the CPR). Alternatively, the Claimants can elect to issue the Claim Form out of the County Court.

I quote the following passage from the CPR, relating to Rule 2.3:

> "The County Court, [in contrast to the High Court] …, is an inferior court with limited legal jurisdiction. Over the years, those limits were relaxed and the problems inherent in the former territorial limits on jurisdiction were largely overcome, mainly by rules enabling the easy movement of cases from court to court. **The introduction, with effect from 22 April 2014, of the single County Court, means that what were previously separate county courts are now local hearing centres of the unified County Court. The CPR contain rules of court applicable to proceedings both in the High Court and in the County Court.**" (CPR § 2.3.11)

17.    I note that an argument is raised on page 14/35 of the OMTD that the Defendants have failed to identify "which court provides the alternative forum". In England the High

Court of Justice is a unified court system, without geographical divisions, which has jurisdiction over claims for personal injury or death (provided that the Claimants can certify that they expect to recover in excess of £50,000). Whilst, for administrative convenience a Claim Form may be issued by a Court Centre in a convenient geographical location, it can be issued in any such Centre in order to be an effective commencement of proceedings engaging the jurisdiction of the Court. It is also the case that a Personal Injury (or wrongful death) claim should be issued in the Queen's Bench Division of the High Court (rather than, for instance, the Chancery Division), but if issued in the incorrect Division the case will be transferred to the correct Division and will proceed there.

As mentioned above, issuing a claim form out of the County Court is very much the same process, and since the County Court is also unified, there is no <u>particular</u> county court which has jurisdiction over any claim.

18.   At (English) common law the jurisdiction of the Courts in England is invoked by <u>service</u> of the Claim Form on the named Defendant within the (geographical) jurisdiction of the Courts – i.e. within England and Wales. This is exemplified in the leading textbook on Conflicts of Laws, *Dicey, Morris and Collins Conflicts of Laws 15th ed.*:

> "The court has <u>jurisdiction</u> … [3] to entertain a claim *in personam*[4] against a defendant (other than a person domiciled or deemed to be domiciled in another Member State or in a Convention State or in Scotland or Northern Ireland) who is present in England and duly served there with process." (Rule 31)

Rule 32 of *Dicey* provides:

> "the court has jurisdiction to entertain a claim *in personam* against a person who submits to the jurisdiction of the court"

---

[3]   The ellipsis refers to exceptions which are not relevant to the present case – i.e. "subject to Rules 36 and 37 (exclusive jurisdiction under the Brussels I Regulation and the Lugano Convention) and Rules 60 and 61 (international conventions)"

[4]   A claim against an individual for damages for personal injury or death is a claim *in personam*.



It is very common for service on an individual to be effected by service upon some agent (whether an insurer or a solicitor (or, for instance, a director of a company)), who has been 'authorised to accept service' on behalf of the proposed Defendant. Such authority is binding on normal agency principles. It amounts in English law of procedure to a concession that service on that authorised person within the jurisdiction counts as valid service on the Defendant within the jurisdiction <u>and</u> as a submission to the jurisdiction of the English Court when such service is effected.

At page 15/35 of the OMTD the Plaintiffs complain that no analysis or authority is provided to prove that service on such a person is effective. In English law the authority granted to (for instance) a firm of lawyers (solicitors) to accept service on behalf of a named Defendant is valid under normal agency principles and service effected in accordance with the authority granted by the Defendant is treated by the Courts as effective service. See CPR Rule 6.7(1) which provides:

> "(1) … where—
> (a) the defendant has given in writing the business address within the jurisdiction of a solicitor as an address at which the defendant may be served with the claim form; or
> (b) a solicitor acting for the defendant has notified the claimant in writing that the solicitor is instructed by the defendant to accept service of the claim form on behalf of the defendant at a business address within the jurisdiction,
>
> the claim form must be served at the business address of that solicitor."

It will be noted that the word 'must' has been included in the last line, so as to avoid any confusion about whether valid service has been effected (service on the Defendant personally after notification has been given under this Rule would not be valid). In contrast, the appointment of any other agent to accept service on behalf of a principal would not prohibit personal service on the principal if this was more convenient to the Claimant.

Therefore, as a matter of English law it is an impossible argument for the Plaintiffs to suggest that, once a solicitor or insurer has been nominated to accept service on behalf of the Defendants, the Plaintiffs could fail to establish that the Courts of England had



jurisdiction to deal with the Plaintiffs' claims in English law arising out of the accident in August 2019.

19.  Also at page 15 OMTD it is suggested that service on a representative counsel rather than on the Defendants personally would restrict the Plaintiffs' choice of Court before which to bring their claim. This is not so. The Plaintiffs, as the parties issuing the claim, choose which court centre to issue from and the Defendants, or their representatives, have no say in the matter. After issue and service have been effected an application can be made by either side to have ongoing procedural matters dealt with in a court centre which is geographically convenient to the parties.

20.  Quite apart from voluntary submission by the Defendants to the jurisdiction of the English Courts, by the mechanisms explained above, the English Courts would undoubtedly accept jurisdiction over the dispute between Plaintiffs and Defendants by application of the English Conflicts of Laws rules which decide what disputes (with a foreign element – here the foreign nationality and present residence of the Defendants) will be accepted for resolution by the English Courts. This is achieved under the Civil Procedure Rules, Part 6, and in particular Rule 6.36. The Court's ruling that jurisdiction will be accepted takes the form of "permitting the Claim Form to be served out of the Jurisdiction". Once that Ruling has been made and confirmed after any challenge that the Defendants seek to make, the English Court will proceed to adjudicate the claim.

Rule 6.36 permits such claims to be made if any of the "grounds set out in paragraph 3.1 of Practice Direction 6B" are met. Practice Direction 6BPD.3.1(9)(a) provides that service out of the jurisdiction will be permitted and the Court will thereby accept jurisdiction over the claim when:

> "(9) A claim is made in tort where—
> (a) damage was sustained, or will be sustained, within the jurisdiction;"

The Plaintiffs' claims are claims in tort and damage arising from the tort was sustained by the Plaintiffs within England.



Since the Defendants have assured the Plaintiffs that they will accept the jurisdiction of the English Courts to resolve this dispute, there can be no doubt that any application under CPR Pt. 36 would succeed. However, as I have sought to explain above, no such application is necessary where Defendants have agreed to submit to the jurisdiction of the English Court and accept service of proceedings in this country through solicitors.

21.   **How will the proceedings progress in England once commenced?**
The Defendants will acknowledge service of the Claim Form, without challenging the jurisdiction of the Court to deal with the dispute. Such acknowledgement confirms the acceptance of and submission to jurisdiction (see Parts 10 and 11 of the CPR).

22.   The next step will be for the Plaintiffs (Claimants in English procedural terminology) to prepare Particulars of Claim, setting out in more detail their claims (this may have been done before service of the Claim Form, in which case the Claim Form will be served with the Particulars of Claim). Once Particulars of Claim are served on the Defendants, they will have a limited time to enter a Defence. The Defence will, as I understand it, admit tortious liability on the part of the First Defendant for the accident and the death of the deceased and put in issue the quantum of the Plaintiffs' claims.

23.   Once an admission of liability has been obtained it is open to the Claimants to apply to 'enter judgment on liability, with damages to be assessed'. This does not bring any particular advantages. Whether or not judgment is formally entered, the procedural steps to follow an admission of liability will deal with the assessment of the appropriate quantum of the Claimants' claims. The Court will encourage the parties to adopt some form of Alternative Dispute Resolution (for instance a mediation or a without prejudice round table settlement meeting) to make unnecessary any further involvement of the Court.

24.   If the dispute continues to require resolution by the Court, there will be directions for exchange of lay witness evidence and expert evidence about quantum. Lay evidence from the Claimants will include evidence touching on the cost of funeral expenses and the fact (if alleged) that the deceased was providing at his death (or was likely to provide had he continued living), pecuniary benefits to the Claimants (or any of them) whether by way



of cash payments for board and lodging or as a contribution to the family household costs, or by way of services having a pecuniary value (such as doing DIY or gardening); together with the quantification of these benefits.

25.   There is a small personal injury claim which may be made for the pain and suffering of the deceased in the short period (whilst conscious) between the occurrence of the accident and his death. It is possible that expert evidence is given to describe that short period and the suffering it brought about to the deceased.

26.   In addition, the Second Claimant will have to show that, as a result of his witnessing the immediate aftermath of the accident, he suffered adverse psychological sequelae, and the personal and financial damage caused by such sequelae. There could possibly be a dispute about what faced the Second Claimant when he arrived at the accident location, but this would probably be something that the emergency services' records would make clear.

27.   Otherwise, as is almost invariable in 'quantum only' litigation, it is unlikely that the Defence will present any lay witness evidence at all, although it is open to it to find evidence from third parties which might cast doubt on the dependency sought to be proved by the Claimants or the long-term reaction of the Second Claimant to the aftermath of the accident.

28.   Both sides will probably have to obtain medical evidence on the claim for psychiatric damage allegedly suffered by the Second Claimant, as there may be a dispute whether the sequelae complained of comprise a psychiatric illness (for which damages may be recoverable) or severe grief and sadness (which are not compensable).

29.   The vast majority of quantum only claims settle before trial – there is no limit to the availability of settlement opportunities (for instance, the parties might wait until after exchange of all evidence and then have a further attempt at settlement). Equally, settlement cannot be guaranteed.



30. **Direct action against Insurers and Enforcement of Judgment**.

At page 5/21 of MMTD the Defendants point out that the Plaintiffs have a direct right of action against the Defendants' motor insurers, USAA Limited, and can pursue this right of action for exactly the same remedies arising out of the accident as are available against the Defendants personally. The Defendants refer to the EU Fourth Motor Insurance Directive 2000/26 art. 3. This Directive was not in fact in force at the date of the accident, having been repealed and codified/consolidated into Directive 2009/103/EC of the European Parliament and of the Council, dated 16 September 2009. Article 18 of that Directive provides (in the same terms as art 3. of the Fourth MID):

> "Member States shall ensure that any party injured as a result of an accident caused by a vehicle covered by insurance as referred to in Article 3 enjoys a direct right of action against the insurance undertaking covering the person responsible against civil liability."

The Directive itself is not sufficient to create a private law direct right of action in the Plaintiffs against the Defendants' Insurance undertaking (USAA Ltd.). The Directive is an instruction to the governments of Member States to enact domestic legislation to satisfy the imperative laid down by the Directive, so as to implement it.

31. As a matter of English law the UK Government implemented the requirements of the (original) Directive in 2002 and created a private law direct right of action between victim and insurance company, by enacting secondary legislation in the form of a (U.K.) Statutory Instrument – *The European Communities (Rights against Insurers) Regulations 2002*, SI 2002/3061. It is this domestic legislation which provides to the Plaintiffs a direct right of action against USAA Ltd. in respect of the causes of action arising out of the accident which occurred on 27 August 2019. Under regulation 3 of that Statutory Instrument[5]:

---

[5]   As amended – see below.



3. - (1) Paragraph (2) of this regulation applies where an entitled party has a cause of action against an insured person in tort or (as the case may be) delict, and that cause of action arises out of an accident.

(2) Where this paragraph applies, the entitled party may, without prejudice to his right to issue proceedings against the insured person, issue proceedings against the insurer which issued the policy of insurance relating to the insured vehicle, and that insurer shall be directly liable to the entitled party to the extent that he is liable to the insured person.

32.   The right of action against the Insurer is correlative to the 'direct liability' of the Insurer which comes into existence at the moment the 'entitled party' acquired his/her cause of action against the Insured person (the Defendants). Therefore, the right of action against Insurers arose in August 2019 and continues to subsist.

33.   I am therefore of the opinion that the Defendants, at p. 5/21 MMTD are correct in law to say that the Plaintiffs have a direct right of action against Motor Insurers USAA Ltd., but they understate the case by referring only to the EU Directive; it is the Regulations enacted by the Statutory Instrument, that create the private law right for the benefit of the Plaintiffs.

34.   I note that the Plaintiffs' expert Catherine Foster at paragraph 33 of Exhibit 1 to OMTD refers to Regulation 3 of the 2002 Statutory Instrument and concludes:

"it is uncertain, however, whether these provisions will remain in force after the UK's departure from the European Union on 31 December 2020"

At pages 15 and 16 (of 35) of OMTD this opinion is taken up by the Plaintiffs[6].

---

[6]   At page 15 of OMTD it is stated that "the … Directive is due to expire on December 31 2020…" This is not so, in that the (Consolidated) Directive – an instrument of European legislation – will continue to exist. Further, rights created directly by the Directive and rights created by the UK Government's legislation in implementing it, created before 31.12.20 continue to have effect as "European Retained Law" under the European Union (Withdrawal) Act 2018 (as amended by the EU (Withdrawal Agreement) Act 2020), including all rights, powers, liabilities, obligations, restrictions, remedies and procedures, previously recognised and available in UK law before 31.12.2020 – see s. 4 of the 2018 Act (as amended).

35.  In my view, as a matter of law, there is no doubt that the Plaintiffs have now, and will continue to enjoy into the future, a direct right of action against USAA Ltd. under the terms of the above Statutory Instrument (as amended) with respect to the tort committed in August 2019. First, as I have stated above, the right of action came into existence at the moment of the accident in 2019. The Plaintiffs could only be deprived of such right of action if legislation were to be passed by the UK Government which took away such rights (which are effectively a form of private property) retrospectively. This is unthinkable.

36.  Secondly, the terms of the Statutory Instrument have been amended recently by the *Motor Vehicles (Compulsory Insurance and Rights Against Insurers) (Amendment) (EU Exit) Regulations,* SI 2020/945, made on 2 September 2020. This amendment will come into force immediately prior to the end of the Implementation Period (31 December 2020) and provides that 'entitled party' under the 2002 regulations is extended to include residents in the United Kingdom and Gibraltar, as well as residents in "a Member State" of the EU. In other words, even after the UK and Gibraltar cease to be "a Member State" UK residents will nevertheless fall within the entitlement of the regulations. As the Explanatory Note to SI 2020/945 states:

> The amendment in regulation 3 ensures that UK and Gibraltarian residents continue to have the right to issue proceedings against the insurer of the person responsible for an accident in the UK after the end of the transition period.

Far from there being doubt about the position that will obtain after 31 December 2020, this statutory instrument clearly provides that the regime in existence since 2002 for direct actions against Motor Insurers continues in existence and will continue until some amendment is passed by the legislature. The latest amendment is a clear (political) indication that no change in the near future is anticipated.

37.  I have been asked to consider paragraph 34 of the opinion of Catherine Foster in Exhibit 1 to the OMTD where she says:

> "the Plaintiffs would be advised as a matter of practice to include both [Defendants] as Defendants in the event that issues arise over the interpretation of or the scope of



> coverage under the contract of insurance. In my experience it would be unusual for any English Barrister to advise a client to forgo the safety net of including the tortfeasors to a Road Traffic Accident as Defendants to the action, in addition to the Insurer".

I am not sure that any issue of English law or procedure is raised by this statement of opinion. The premise of it is that some liability has been incurred by the Defendants to the Plaintiffs which does not fall to be indemnified by the Insurers. In the event that Insurers have confirmed that any liability established against the tortfeasor on the pleaded case will be indemnified by Insurers and paid to the Plaintiffs, I cannot see what legal principle would encourage or justify the Plaintiffs in joining more parties than necessary for resolution of their case for compensation.

I would concur in a practice which insisted on joining all available parties <u>for some reason</u>. However, I would not adopt such a practice unless it could be shown to have a legal benefit in the particular case under consideration. On the information available to me at present I cannot understand why joining the tortfeasors to an action against the motor insurer is supposed to present any legal benefit to the Plaintiffs.

38.  **Enforcement of Judgment against the Defendants**.

The OMTD at pp. 16 and 17 of 35 points out that the Defendants do not have assets in the United Kingdom against which any judgment obtained against them could be enforced. The MMTD refers in this context to section 151 of the English legislation comprising the Road Traffic Act 1988 (p. 5 of 21 of MMTD), and I am asked to give my legal opinion on the effect of this section. Section 151 is entitled

> "Duty of insurers… to satisfy judgment against persons insured … against third-party risks."

The scheme of the section is to provide that, where a tortfeasor has incurred a liability which is required to be insured under the compulsory insurance provisions of Part VI of the 1988 Act, and where such compulsory insurance has been obtained (and certified by the issue of a certificate of insurance to the policyholder) and covers the circumstances



of the case, then any judgment obtained against the tortfeasor may be enforced directly against the Insurer. Section 151(5) provides:

> "Notwithstanding that the insurer may be entitled to avoid or cancel, or may have avoided or cancelled, the policy …, he must, subject to the provisions of this section, pay to the persons entitled to the benefit of the judgment—
>
> (a) as regards liability in respect of death or bodily injury, any sum payable under the judgment in respect of the liability, together with any sum which, by virtue of any enactment relating to interest on judgments, is payable in respect of interest on that sum, …
>
> (c) any amount payable in respect of costs."

39.   I am instructed that USAA Ltd. accepts that any judgment obtained in England against the Defendants will be the subject of indemnity under the policy issued by it to the Defendants. It is clear that the accident suffered by the deceased occurred on a public road where motor insurance was compulsory. I can therefore see no reason in law why any judgment obtained against the Defendants cannot be enforced against USAA Ltd. under the terms of section 151 of the 1988 Act.

40.   **Is the Second Defendant vicariously liable for the negligent driving of the First Defendant?**

Paragraph 44 of the Plaintiffs' complaint alleges that "Jonathan Sacoolas has vicarious liability for the conduct, actions or omissions committed by Defendant Anne Sacoolas while operating the subject vehicle owned in whole or in part by Jonathan Sacoolas." Paragraph 56 alleges: "Pursuant to the doctrine of vicarious liability, because Jonathan Sacoolas was the owner in whole or in part of the subject vehicle he is vicariously liable jointly and severally for all the damages caused by the Defendant Anne Sacoolas' operation of said vehicle."

41.   I have been asked whether, in English law, these allegations are sufficient to establish a case of vicarious liability. In my opinion, the allegation in the pleading is contending that ownership of a vehicle is sufficient to generate vicarious liability on the part of the owner



for the negligence of any person who is operating it. As a matter of English law that proposition is incorrect. Vicarious liability arises in person A for torts committed by person B when there is a relationship of employer/employee or similar[7] between A and B, or a relationship of principal and agent between A and B.

As stated in *The Law of Motor Insurance* by Merkin & Hemsworth (2nd ed. 2015) at p. 250:

> "Ownership of the vehicle alone is insufficient to make the driver the agent of the owner ..."

42.   I note that in paragraph 57 of the Complaint it is alleged that at the time of the accident the First Defendant was driving her (and the Second Defendant's) children to the family home from dinner with the Second Defendant (on the military base)[8]. In the OMTD at p. 31 of 35 it is argued that vicarious liability for the negligence of the driver in English law is created by such circumstances by reason of the agency route described above. I agree that that is the only route by which a contention for vicarious liability *might* be argued. In the case of *Hewitt v Bonvin* [1940] 1 KB 188 MacKinnon LJ said:

> "If A suffers damage by the wrongful act of B, and seeks to say that C is liable for that damage he must establish that in doing the act B acted as the agent or servant of C. If he says that he was C's agent he must further show that C authorised the act." (p. 191)

43.   Whether such argument is available to the Plaintiffs in the present case will depend on both fact and law. I am asked to consider English law alone. Nevertheless, the law is illustrated and illuminated by factual examples in the case law.

44.   In *Launchbury v Morgans* [1972] A.C. 127 various passengers in a car sought to sue Mrs. Morgans, the owner of the car for injuries suffered in an accident which had been caused

---

[7]   A relationship analogous to employer/employee may be sufficient – for instance that between a main contractor and an independent sub contractor, or (as in *The Christian Brothers* case cited by Catherine Foster at §§ 23 ff.) – if there is sufficient 'control' by the former over the activity of the latter. But there is no principle of English law which would make a husband vicariously liable for the acts of his wife (or vice versa) on such basis of control.

[8]   Extra detail is provided in the OMTD at page 32 of 35.

by the negligence of a Mr. Cawfield, the driver of the car[9]. The circumstances were these: Mrs. Morgans was the registered owner of the car[10], although she 'shared' it with her husband in the sense that he could use it when he wanted. He used to visit public houses by using the car. He had an agreement with his wife that if he became inebriated and unfit to drive he would get a sober friend to drive him home. On the day in question he was inebriated and asked Mr. Cawfield to drive him home. Mr. Cawfield drove negligently and caused the accident which injured the passengers. The passengers contended that Mr. Cawfield was driving as Mrs. Morgans' agent at the time of the accident so as to make her vicariously liable for the fault of Cawfield.

45.   One of the passengers' arguments was that vicarious liability would arise if the widow had an "interest or concern" in the conduct of the driver, even where there was no agency agreement between them. At p. 135 Lord Wilberforce said:

> "...I regard it as clear that in order to fix vicarious liability upon the owner of a car in such a case as the present it must be shown that the driver was using it for the owner's purposes, under delegation of a task or duty ...The substitution for this clear conception of a vague test based on "interest" or "concern" has nothing in reason or authority to commend it. Every man who gives permission for the use of his chattel may be said to have an interest or concern in its being carefully used, and, in most cases if it is a car, to have an interest or concern in the safety of the driver, but it has never been held that mere permission is enough to establish vicarious liability."[11]

---

[9]   As a historical side-note, it was at this time compulsory for a driver to have insurance to cover liability to 'outside' third parties, but not compulsory to be insured against liability to one's own passengers (see Visc. Dilhorne at p. 138 of *Launchbury v Morgans*). For this reason the liability of Cawfield to the passengers was probably not insured by his insurance policy and it was not covered by the MIB scheme which only provided compensation in respect of any uninsured risk when it was compulsory to insure such risk. Hence the search, in a number of cases, for a Defendant with deep pockets.

[10]   In fact the person registered in relation to a motor car is registered as the 'keeper' of the car, not the owner. The registered keeper is (for instance) liable to provide information as to who was driving the car if it is caught in a speed trap; liable to tax and insure the car; and strictly liable to pay parking tickets. Being the registered keeper is not a guarantee of ownership or title.

[11]   Lord Salmon said at p. 148 F "mere permission to drive is not enough to create vicarious responsibility for negligence"



The argument was rejected on similar grounds by Lord Cross of Chelsea at pp. 144 – 145 and Lord Salmon at pp. 149 - 150.

46.   Later, Lord Wilberforce set out the circumstances in which the owner of a car <u>could</u> be vicariously liable for the driver of it:

> "I accept entirely that "agency" in contexts such as these is merely a concept, the meaning and purpose of which is to say "is vicariously liable", and that either expression reflects a judgment of value—*respondeat superior* is the law saying that the owner ought to pay. It is this imperative which the common law has endeavoured to work out through the cases. The owner ought to pay, it says, because he has authorised the act, or requested it, or because the actor is carrying out a task or duty delegated, or because he is in control of the actor's conduct. He ought not to pay (on accepted rules) if he has no control over the actor, has not authorised or requested the act, or if the actor is acting wholly for his own purposes. These rules have stood the test of time remarkably well."

47.   Lord Pearson (at p. 140) gave the most comprehensive description of the circumstances in which one person (the owner) can be vicariously liable for the tortious driving of the owner's car by another:

> "If the car is being driven by a servant of the owner in the course of the employment or by an agent of the owner in the course of the agency, the owner is responsible for negligence in the driving. <u>The making of the journey is a delegated duty or task undertaken by the servant or agent in pursuance of an order or instruction or request from the owner and for the purposes of the owner</u>. For the creation of the agency relationship it is not necessary that there should be a legally binding contract of agency, but <u>it is necessary that there should be an instruction or request from the owner and an undertaking of the duty or task by the agent</u>. Also the fact that the journey is undertaken partly for purposes of the agent as well as for the purposes of the owner does not negative the creation of the agency relationship: *Hewitt v. Bonvin* [1940] 1 K.B. 188, 194, 195; *Ormrod v. Crosville Motor Services Ltd.* [1953] 1 W.L.R. 409, Devlin J.; [1953] 1 W.L.R. 1120, C.A.; *Hilton v. Thomas Burton (Rhodes) Ltd.* [1961] 1 W.L.R. 705, 707; *Norton v. Canadian Pacific Steamships Ltd.* [1961] 1 W.L.R. 1057, 1063; *Klein v. Caluori* [1971] 1 W.L.R. 619, 621.



I think there has to be an acceptance by the agent of a mandate from the principal, though neither the acceptance nor the mandate has to be formally expressed or legally binding." (emphasis added)[12]

48.    I have insufficient information about the circumstances in which the First Defendant was using the car in question (nor even whether the car was owned solely by one Defendant or the other, or shared between them) to be able to apply the law to hypothetical facts. However, it may be worth pointing out that in *Launchbury v Morgans* the Court of Appeal (whose decision was overturned by the House of Lords) adumbrated (by a majority of 2:1) a new 'rule' for vicarious liability in the context of driving cars, which was roundly rejected by their Lordships.

49.    Lord Wilberforce summarised the theory put forward by Lord Denning M.R. in the Court of Appeal:

"The respondents submitted that we should depart from accepted principle and introduce a new rule, or set of rules, applicable to the use of motor vehicles, which would make the appellant liable as owner. Lord Denning M.R. in the Court of Appeal formulated one such rule, based on the conception of a matrimonial car, a car used in common by husband and wife for the daily purposes of both. All purposes, or at least the great majority of purposes, he would say are matrimonial purposes: shopping, going to work, transporting children, all are purposes of the owner; the car was bought and owned for them to be carried out. And, consequently (this is the critical step), the owner is *ipso jure* liable whatever the other spouse is using the car for, unless, it seems, though the scope of the exception is not defined, the latter is "on a frolic of his own." Indeed Lord Denning M.R. seems to be willing to go even further and to hold the owner liable on the basis merely of permission to drive, actual or assumed."

50.    Lord Wilberforce roundly rejected this suggested theory:

"I have come to the clear conclusion that we cannot in this House embark on the suggested innovation."

---

[12]    See also Lord Salmon at p. 148 C ff.



It may be relevant to note that in his speech Lord Wilberforce compared this rejected 'new theory' put forward by the Court of Appeal with developments of the law along similar lines in the USA, in both case law and statutory contexts (see p. 136 between letters F to H).

51.   Lord Wilberforce's reasoned rejection[13] of the suggested rule of law put forward by Lord Denning MR means that it can be stated with confidence that:

(1)   Vicarious liability on the part of the owner of a car cannot be ascribed in law merely from the fact that one spouse out of a couple is driving the 'matrimonial car' – i.e. a car, formally owned by one spouse, but being driven by the other;

(2)   Vicarious liability on the part of the owner of a car cannot be ascribed in law merely because the car is used as a 'family car', available for the use of all members of the family;

(3)   Vicarious liability cannot be ascribed in law merely based on the owner's having given permission to the driver to drive it. (see pp. 136 to 137)

52.   Viscount Dilhorne, in the *Launchbury* case also emphasised the necessity of showing, for a finding of vicarious liability, that the 'principal' had <u>actually delegated a task</u> to be <u>performed on his behalf and for his benefit</u> by the 'agent'. He gave as an example:

"A person permitted to drive another's car does not become the latter's agent if, on his own volition, he uses it for the owner's benefit; a son driving his father's car with permission does not become his father's agent because, remembering that his father has a suit at the cleaners, he uses the car to collect it."

53.   In the Court of Appeal in *Launchbury* Megaw LJ gave a dissenting judgment which was then approved in the House of Lords[14]. In the course of that judgment Megaw LJ reiterated and reinforced the decision in *Hewitt v Bonvin* that only where it was "...proved that at the material time the driver had authority, express or implied, <u>to drive</u>

---

[13]   The supposed new rule was also rejected, for the same or similar reasons by Lords Pearson at p. 142 H ff., Lord Cross at p. 145 C ff. and Lord Salmon at p. 151.

[14]   See Lords Wilberforce and Salmon in particular.



on the owner's behalf"[15] could vicarious liability be established. "Such liability depends not on ownership, but on the delegation of a task or duty" (emphasis added). Megaw LJ then turned to consider whether a spouse, driving a car for a 'family purpose' satisfied this test. He said:

> "Everyone would agree that a wife has an interest in the safety of her husband and in his accident-free driving; and that she has an interest in the safety of the car. But it cannot seriously be suggested that that interest by itself is such as to make any driving of the car by the husband, as a matter of law, driving "for the wife's purposes." If it were so, it would extend equally to a parent's interest in the safety of his child, as well as of his car; and *Hewitt v. Bonvin* [1940] 1 K.B. 188, it would follow, was wrongly decided ..."

54.    It is obviously a matter for my instructing clients and the Courts of Virginia whether there are sufficient facts available to decide whether a claim of vicarious liability can be advanced on the facts of the present case.

55.    However, there are some examples which I can consider. For instance, if the car in question was owned or shared by both Defendants or if both of them had equal right to use it, then a comment from Lord Cross at p. 145 of *Launchbury* is apposite. He said:

> "To my mind, the very fact that each joint owner has an equal right to use the car shows that when one joint owner is driving it, otherwise than in pursuance of a request by another, he ought to be regarded as driving it on his own behalf".

If the facts show that the First Defendant, with the couple's children, had visited the Second Defendant in the 'family car', to have dinner with him on base and was then simply returning home with the children (where she and the children lived), then I cannot see how an agency relationship could have sprung up by which the Second Defendant was delegating a task to the First Defendant to be carried out by her on his behalf to take the car and the children back to where they had come from, namely where the First Defendant and the children lived. This example represents the 'rule' which Lord Denning favoured and which was roundly rejected by the House of Lords in *Launchbury*.

---

[15]   A statement of principle approved in the House of Lords – see (e.g.) Lord Salmon at p. 149 B

At the other extreme, if the Second Defendant said to the First Defendant: "I have to get these work assignment papers home by tonight, but there is no way I can do it because I won't be leaving the base – can you carry them home for me and keep them safe?" then one can see the argument that such circumstances fall within the requirements for an agency relationship as anticipated in *Hewitt v Bonvin* and as accepted by the House of Lords in *Launchbury* to be sufficient to generate vicarious liability.

56.   Catherine Foster refers at § 27 in Exhibit 1 to the OMTD to a case called *Norwood v Navans* [1981] RTR 457 – a decision in the Court of Appeal. In that case it was alleged that the owner's wife was acting as his agent when she borrowed his car (with his permission) to go to town (she only had a provisional driving licence, so should not have been driving the car without an accompanying driver). In town she amused herself with her friends but also did some general household shopping. It was argued unsuccessfully that, since the shopping was for the benefit of the husband/owner he should be vicariously liable for her negligent driving.

57.   The Court of Appeal reviewed the authorities on this topic, culminating with *Launchbury v Morgans* and considered the 'Lord Denning' test which had been rejected by the House of Lords. Ormrod LJ said:

> "Speaking for myself, I do not think I can begin to distinguish the facts of the present case from the situation envisaged by Lord Denning M R when he put forward his solution to the case of *Launchbury v Morgans*. It seems to me that, if we were to hold that the mere fact that some part of this trip which the wife was doing was for what was called 'general shopping' made her the agent of her husband, we should be getting into the position where, in any of these cases, it would be necessary to examine the contents of the shopping basket to see what had been purchased that day. We would be pushed into the absurd position of saying that, if all the purchases had been for the wife personally, there was no agency whereas, if she bought some minor household article, she would be an agent for the husband – a distinction, which is really absurd. …
>
> The fact of the matter is that the law as laid down by the House of Lords is based on proper proof of agency. In the absence of proper proof of agency, then there is no vicarious liability in a situation such as this. I do not think the facts as found by the



> judge, with all respect to him, amount to proof of agency of the wife on behalf of her husband. At the very most she was doing the general shopping. The greater part of the expedition was clearly for her own purposes."

58.   The other member of the (2-man) Court of Appeal, Purchas J. said this:

> "The authorities clearly establish two propositions. First of all, the mere knowledge of use to be made of a car has never been sufficient to attach vicarious liability to the owner. Secondly, since the matter was considered in the House of Lords in *Launchbury v Morgans*, that there <u>must be some specific delegation, either of a risk or a duty, or specific control of the actor's conduct</u>. Ormrod LJ has already referred to the speech of Lord Wilberforce in that case and it will not serve any purpose if I repeat that quotation. <u>The concept of a general liability as between spouses encapsulated in the expression 'the matrimonial car' was not accepted by the House of Lords</u>.
>
> In my judgment <u>the judge here has fallen into the error of constructing a specific act of delegation from the relationship between the parties</u> – that is, husband and wife – and the knowledge of the use by his wife that the husband had and the facts that amongst the uses to which the car was put included … a substantial element of domestic purposes, so as to import the law of *respondeat superior*."

59.   It may be that this case really represents nothing more than the example cited by Viscount Dilhorne (at § 52 above). However, it certainly does not support the suggestion that the facts in the present case establish the existence of vicarious liability.

60.   **Is an award for "Loss of Intangible Benefits" available in law under the provisions of the Fatal Accidents Act 1976 ("FAA")?**

Paragraph 83 of the Plaintiffs complaint (p. 14 of 21) pleads that the Plaintiffs have suffered "deep sorrow, severe mental anguish, the loss of society, the loss of companionship, loss of affection, loss of home services, loss of future economic support, loss of comfort, guidance and advice … and other intangible benefits, and have incurred funeral expenses and related expenses".

61.   It is common ground that the damages available to the Plaintiffs are those that arise in English Law. The MMTD at page 16 of 21 contends that the only claim available to the



Plaintiffs under the English FAA is for financial loss comprising "funeral expenses and dependency on income and services"; and that "there are no allegations that [the deceased] contributed to household expenses or that his parents or brother had a reasonable expectation of pecuniary benefit [from him]".

62. At page 29 of 35 the OMTD contends that "Plaintiffs are entitled to collect damages for the loss of approximately 6 decades worth of intangible benefits Harry would have bestowed [on] his family members". It cites the opinion of Catherine Foster at §§ 17-21 of her opinion in Exhibit 1.

63. I am asked to state my opinion of the content of English Law with respect to the recoverability by the Plaintiffs of 'intangible benefits' lost by reason of the death of the deceased.

64. In case there is any doubt on the matter, the fact that the individual Plaintiffs all qualify as 'dependants' under section 1(3)(c) (as parents) and (g) (as brother) does not itself signify that they are entitled to damages under the Act in respect of 'Loss of Dependency'. Being a dependant merely entitles one to seek to prove that one was actually financially dependent on the deceased at the date of death.

65. The actual damages which are to be awarded to dependants under the FAA are identified by section 3(1) of the Act:

> "In the action such damages, other than damages for bereavement[16], may be awarded as are proportioned to the injury resulting from such death to the dependants respectively."[17]

66. The leading textbook on the English Law of Damages is *McGregor on Damages* - 21st Edition published on 17th December 2020. It sets out how this section has been interpreted by the courts since its first appearance in substantially the same form in 1846.

---

[16] It is common ground that no damages for bereavement are available in the circumstances of this particular action.

[17] In addition, under section 3(5) of the Act, funeral expenses may be claimed if they fall on a dependant. I believe this is common ground between the Plaintiffs and Defendants in this matter.



Recovery is restricted to "to damages for the loss of the <u>pecuniary</u> benefit arising from the relationship which would be derived from the continuance of the life" (§ 41-017).

67. McGregor continues:

> It was early established in *Blake v Midland Ry* (1852) 18 QB 93, that the mental suffering of a wife for the loss of her husband could not be considered in computing the damages, and thus from the start the action became limited to pecuniary loss. The two most authoritative statements of this principle emanate from the House of Lords. First, Viscount Haldane LC in *Taff Vale Ry v Jenkins* [1913] A.C. 1 said:
>
>> "The basis is not what has been called solatium, that is to say damages given for injured feelings or on the ground of sentiment, but damages based on compensation for a pecuniary loss."
>
> More recent and more graphic is Lord Wright in *Davies v Powell Duffryn Collieries* [1942] A.C. 601
>
>> "There is no question here of what may be called sentimental damages, bereavement or pain and suffering. It is a hard matter of pounds, shillings and pence."

Therefore the <u>only</u> availability of damages for non-pecuniary loss is provided by way of the Bereavement Award (a fixed sum of £12,980, to be divided between those entitled to it), which does not arise on the facts of the present case.

68. The <u>pecuniary</u> loss which is claimable is the pecuniary value of income or services which would have been provided to the dependant had the deceased continue to live. As it is put by McGregor:

> "There remains the loss of the pecuniary benefit arising from the relationship which would be derived from the continuance of the life and which may consist of money, property or services: in other words, the value of the dependency. The dependant is



entitled, by clear principle of law, to full compensation for the loss of this pecuniary benefit, but … to no more."[18]

It is not necessary to prove a legal entitlement to such income or services prior to death, nor indeed that income or services were actually contributed before death: it is sufficient to prove a "reasonable expectation of pecuniary benefit", as of right or otherwise, from the continuance of the life, whether at the time of death or at some date in the future. (McGregor § 41-029 to 030).

69.    However, as a matter of English law, it is essential that the dependants prove that, but for the death of the deceased, he would have provided a pecuniary benefit to the dependants, whether by way of the provision of part of his income (the so called 'disbursement dependency'[19]) or by way of services (such as DIY or gardening), which is now lost as a result of his premature death.

70.    It is at this point that I have difficulty in following the Plaintiffs' case. There seems to be no case put forward that the deceased provided part of his income (if any – there is no evidence or plea that he had any income) to his parents or his brother; or would have done so at some stage in the future, so as to establish that the Plaintiffs were, or would in the future have become, dependent on Harry's financial contributions to the household[20]. Nor is there any case put forward that he provided services, with a pecuniary value, to his family before his death.

71.    However, if it is alleged and can be proved that the deceased was providing (or would in the near future have been providing, had he not died) valuable services to the dependants, which services have now been lost as a result of the death, there is no doubt that a claim for damages under the FAA will be available to compensate for the loss of such services.

---

[18]  The ellipsis indicates the exceptions of funeral expenses, interest, and damages for bereavement.
[19]  Per Simon Brown J. in *Cresswell v Eaton* [1991] 1 W.L.R. 1113 at 1118H.
[20]  § 83 of the Complaint does allege that the Plaintiffs have suffered "loss of future economic support", but there is no further detail as to what this entails. Page 29/35 of the OMTD does not help: there, it is stated that the Plaintiffs have suffered loss of 'intangible benefits', but there is no suggestion that the death of the deceased brought about any pecuniary loss to the Plaintiffs, whether by way of loss of contributions from income or by way of contribution by provision of valuable services.



This was decided as long ago as 1915 in *Berry v Humm & Co.* [1915] 1 KB 627, Scrutton J.[21]

72.   Thus, in the reverse situation where a mother has been unlawfully killed, the dependent children (and husband) will have a claim for the loss of maternal services to the children (perhaps replaced by a nanny or governess) and the loss of housekeeping services to the whole family (perhaps replaced by a professional housekeeper). *Prima facie* the <u>cost</u> of employing a nanny and a housekeeper will represent the value of the lost services which is to be compensated.

73.   In the case of Harry Dunn, let us suppose that he provided to his parents (or would have provided in the future, but for his death) services in the form of DIY or gardening whilst living at home (perhaps rent free[22]). The cost of replacing those services (for the period into the future which represents the period during which the deceased would have continued to provide them) is compensable as a pecuniary loss brought about by the unlawful death.

74.   It is only in assessing this head of loss that the concept (in English law) of "intangible benefits" comes in. What if replacing (e.g.) the deceased's DIY services with professional services doesn't really replicate the value of what the deceased used to do round the house? It might be said:

> "in the old days, if a fuse blew, the deceased was always there to replace it; the apparatus would be working again in minutes. Now, not only do I have to bother myself with arranging for an artisan to provide a professional repair, but I have to wait until the artisan is available to come, during which period my apparatus fails to operate and provide its benefits to me. So an award of the straightforward pecuniary cost of the

---

[21]   Headnote: "the damages recoverable in [a Fatal] action are not limited to the value of money lost, or the money value of things lost, but include the monetary loss incurred by replacing services rendered gratuitously by the deceased where there was a reasonable prospect of their being rendered freely in the future but for the death".

[22]   Had he been paying rent, then the value of the rent, after deduction of the costs of providing him with accommodation (and possibly board as well), would have been a pecuniary element of lost dependency. Of course, if a young person is only making a *contribution* to his costs of keep, his death may represent a pecuniary saving to the parents, rather than the loss of a pecuniary benefit. All cases must be assessed on their own facts.



> professional artisan <u>undercompensates</u> me for the loss of the service provided by the
> deceased. I cannot practically get a professional service which <u>exactly</u> replicates the
> lost benefit of the deceased's services. I therefore want an extra element of
> compensation to recognise the "intangible benefit" of the economic service provided
> by the deceased, compared to that provided by the professional service obtained in
> substitution."

75.  As stated in *McGregor* (§ 41-101):

> "The amount of such loss of gratuitous services will often be calculated by the expense
> incurred in procuring for the surviving partner the services of a housekeeper or house
> help since the death… [See] *Regan v Williamson* [1976] 1W.L.R. 305."

76.  It is in this context that the issue arises in English law whether "intangible benefits" can
attract compensation. In a number of cases it has been decided that the argument is a
good one – the cost of a professional nanny does not fully replicate the lost service of a
loving mother, and an extra award to compensate for the lost 'intangible benefit' of
having a mother rather than a nanny is awarded. At first, the court rationalised the award
of an additional sum by finding that the pecuniary value of the deceased mother's
services in bringing up a child well included a value to the child in financial terms in
later life in that he was ready and able to secure more valuable employment (see *Regan
v Williamson* [1976] 1W.L.R. 305).

77.  It should be pointed out that the award for the 'intangible benefit', so defined, is of the
order of £5,000 and not more (see *McGregor* § 41-104).

78.  However, the circumstances of the present case do not concern the pecuniary value of
the lost services of a parent bringing up a child, but the value of the lost services of a
young adult to his parents in (presumably, but no details are given) providing valuable
services 'around the house'. In these cases, it is right to say that similar small awards
have been made by the courts, based on the irreplaceable 'intangible benefit' of the
adult's services when compared to the service provided by the professional replacement.

79.  In this latter category, decisions have gone both ways. However, those which have
decided that an award for 'intangible benefit' should be made, have failed to identify (in



the manner in which it was done in *Regan v Williamson*) why the loss of the original service, even though replaced by a professional, paid for, service (for which a damages award is also made), still represents a <u>pecuniary</u> loss to the dependant. *McGregor* says (§ 41-106 ff.):

> "There is a conflict in authority concerning whether a claimant can recover for, as the claimant expressed it in *Grant v Secretary of State for Transport* [2017] EWHC 1663 (QB) loss of "the convenience, comfort and security of having someone who gave this help [of personal gratuitous services] out of love and affection". The recognition of this award was first made by analogy with the cases that allow recovery for the child's loss of a parent's special care—the so-called *Regan v Williamson* factor. It was held in *Beesley v New Century Group Ltd*, [2008] EWHC 3033 (QB) that there was no reason why the *Regan v Williamson* factor, as this element in that case has come to be called, should feature only in claims on behalf of children and not be extended to a case where the claim was brought by a spouse for the loss of personal benefit of the other spouse[23]. **It is difficult to categorise this loss of intangible benefits, to adopt the term used in *Beesley*, as a pecuniary loss. Yet, recovery for non-pecuniary loss, as we have seen, has never been permitted in Fatal Accidents Act claims**, (bereavement loss now statutorily apart). As we have also seen, it was the suggestion, initially appearing in this text, that a mother's personal attention to a child's upbringing could lead in the long run to pecuniary advantages upon which *Regan v Williamson* built, and this can hardly be said similarly of a spouse or partner's [or adult child's] personal attention day by day to the life of their spouse or partner [or parent]. Nevertheless in *Devoy v William Doxford & Sons Ltd* [2009] EWHC 1598 (QB). a further award was made along these lines. This seems dubious, and it is significant that the trial judge recognised that there might be an overlap between such an award and the award for bereavement. A more subtle approach was taken in *Fleet v Fleet* [2009] EWHC 3166 (QB), where Mackay J held that the *Regan v Williamson* principle should not automatically be extended to spouses, although in that case it was justified because the surviving wife was much older than the deceased and she would have needed more than usual care as time went on. Just as the additional care given to children can have pecuniary benefits in the long run, so too can additional care to an aged spouse or partner have greater

---

[23] And logically, where a claim is brought by a parent for the loss of services from a child.



pecuniary benefit in the long run. Nevertheless, this award now seems to be made as a standard item of damages."

80.   In my view, English law does not permit an award for any sort of 'general damages for loss of amenity' arising out of the difference between the (now lost) service being provided by the deceased and the substitute service being provided by a professional. The FAA <u>only</u> permits damages based on pecuniary loss. The difference in 'value' between the original service and the substitute must be justified by establishing a pecuniary <u>loss</u> which persists in spite of the provision of the substitute service.

81.   In support of this view, *McGregor* states:

"Beyond [the] additional care that leads to greater pecuniary benefit, however, it is difficult to justify a claim for loss of intangible benefits of having services performed by the deceased. One such intangible loss is the inconvenience that arises from having to spend time to find someone to do that which the deceased spouse or deceased partner would have done voluntarily. In *Mosson v Spousal (London) Ltd.* [2016] EWHC 1429 (QB), Garnham J said that [such] frustration and inconvenience is the sort of claim that bereavement damages were meant to cover. Again in *Magill v Panel Systems (DB) Ltd* [2017] EWHC 1517 (QB), Judge Gosnell, sitting as a Deputy High Court judge, said that the nature of this type of claim for intangible benefits is the <u>irrecoverable</u> "perceived advantages of having a service performed by a member of the family rather than a commercial provider". Another characterisation of the loss has been said to be the loss of the time itself, irrespective of any inconvenience. In *Grant v The Secretary of State for Transport* (supra), Martin Chamberlain QC, sitting as a Deputy High Court judge, declined to follow the decision in *Mosson*. In his view, the loss was simply the time spent by the wife to make arrangements for a painter, plumber or decorator to perform work that her husband would have done [which] has a pecuniary value. So too, in *Blake v Mad Max Ltd.* [2018] EWHC 2134 (QB), a Deputy High Court judge allowed £2,500 for the intangible benefits of a spouse including the loss of household services such as making beds, for which no pecuniary expense would be incurred, and the inconvenience due to time taken to organise the provision of other replacement services. But if the lost intangible benefits do not involve pecuniary loss, and if it cannot be recovered as frustration or inconvenience then it is hard to see how the mere lost



"time" is a real loss in the sense of some adverse consequence experienced by the plaintiff, [let alone a pecuniary loss]."

82.  Thus, as an expert complying with CPR Part 35 rules I am obliged to point out to the Court that there is an alternative view to mine and the Editors of *McGregor* which has proved persuasive to a number of first instance judges. Their decisions are not authorities with the power of precedent, but they are bound to have persuasive value, as will the decisions (such as *Mosson*) and the statement of such an authoritative work as *McGregor* which support my view of the law.

83.  The sums involved in these awards for so-called 'intangible benefits' are small in the scheme of FAA awards, and it is not surprising that the Court of Appeal has rendered no authoritative ruling on the point. However, such a ruling is definitely required to resolve the doubts about this form of award.

84.  I should, however, add this comment: I am not convinced that the understanding on the part of the Plaintiffs' legal advisors in USA of the meaning of the term 'intangible benefit' is the same as the understanding in English law of that term as used in the cases referred to above (and therefore the understanding of Catherine Foster). As I have attempted to explain above, in English law the term 'intangible benefit' in the context of a permissible FAA claim, is a very small add-on to the pecuniary loss which can be proved by reference to the cost of services provided in substitution for those previously supplied by the deceased, to compensate for the slight difference in convenience, time and organisational effort suffered by the dependant in arranging the substitution. My reading of the Plaintiffs' Complaint and the OMTD suggests to me that the Plaintiffs wish to recover damages for the loss of the intangible benefit of having the deceased by their side for the rest of their lives. This loss of benefit is <u>clearly</u> not compensable under the FAA.

**Conclusion.**

85.  My conclusions may be summarised as follows:



(1)    In English law the Courts of England are available to resolve any dispute between the Plaintiffs and the Defendants and/or their Motor Insurers by the following routes:

    a)  By the Defendants agreeing to submit to the jurisdiction of the English Courts and agreeing that service of process to commence proceedings may be effected on lawyers (solicitors) nominated by the Defendants to accept service on their behalf; there is no need for the Defendants, or either of them, to be physically present in England in order to submit to the jurisdiction of the English Courts and to be validly served in England;

    b)  Alternatively, the Plaintiffs can make an application to the English Courts under CPR Pt. 6 to permit the Plaintiffs to serve the originating process (i.e. the Claim Form) upon the Defendants in the USA; this application would, in my opinion, be bound to succeed and the Defendants would then be validly brought within the jurisdiction of the English Courts. However, this slightly cumbersome process is made unnecessary because of the agreement and submission set out in sub paragraph (a) above.

(2)    However, there is no necessity for the Plaintiffs to sue the Defendants in respect of the tortious driving of which the Plaintiffs complain, since the Plaintiffs are entitled to bring exactly the same action, and to obtain exactly the same remedy, by suing the Defendants' Motor Insurers, USAA Limited, in the courts of England. This remedy arises under the English Statutory Instrument *The European Communities (Rights against Insurers) Regulations 2002*, SI 2002/3061, and will not be adversely affected by the United Kingdom's Withdrawal from the European Union on 31 December 2020.

(3)    Similarly, the effective enforcement of any judgment obtained against the presently selected Defendants does not depend on those Defendants having any assets in the United Kingdom. Any judgment obtained against the Defendants will be directly enforceable against USAA Ltd under the provisions of section 151 of the Road Traffic Act 1988, even if it is not joined as a Defendant under the above Statutory Instrument.



(4)    Given that the Defendants and their insurers have conceded the liability of the First Defendant in negligence for the road accident which occurred in August 2019, the action in England would proceed to a 'Quantum only' Trial. It is unlikely that the Defendants would themselves be able to give any relevant evidence relating to quantum. The Plaintiffs will give evidence of the pecuniary losses suffered by them which are recoverable under the FAA, of the pain and suffering caused to the deceased during the period between the accident and his death and of the psychological sequelae alleged by the Second Plaintiff. It is unlikely that the Defence will adduce any lay evidence (other than written records) but may adduce some expert medical evidence. Settlement of the action will be encouraged by the Court. Statistically, the case would be very likely to settle.

(5)    The circumstances in which the owner of a vehicle can be held vicariously liable for the tortious conduct (negligence) of the driver of the vehicle are clearly set out by the House of Lords in *Launchbury v Morgans* discussed above. It is unclear how the Plaintiffs seek to put a case in vicarious liability in this case, and so I cannot comment much further. If there is a suggestion that the owner of a 'family car' or 'matrimonial car' is vicariously liable for the negligence of the driver, (because the driver is acting for the benefit of the owner or the family or the matrimonial unit) has been rejected by the House of Lords in *Launchbury* and by the Court of Appeal in other cases discussed above.

(6)    Damages under the FAA 1976 are strictly limited to pecuniary losses only. A claim for such losses requires the Plaintiffs to prove that the deceased would have continued to provide net financial assistance to the Plaintiffs but for his death, whether by contributing cash (or property) to them or by performing some valuable service for them. In some English cases damages have been awarded in respect of the direct pecuniary cost of replacing a service (e.g. by hiring a professional to provide that service) and have been 'topped up' by a small amount to represent the 'Loss of the Intangible Benefit' of no longer having the service provided by the deceased. In my opinion such a 'top up' can only be recoverable if it represents a real loss of pecuniary benefit (albeit one difficult to value) suffered because the



engagement of the professional has not provided as much pecuniary benefit as the provision of the original service. However, some decisions at first instance seem to have awarded the 'top up' on a less principled basis. Nevertheless, the 'Loss of Intangible Benefit' cannot be characterised as a general loss of amenity suffered by reason of the death of the deceased, since damages of such character are prohibited by the FAA (save to the extent that such damage is part of the Bereavement award, which is not available on the facts of the present case).

**Howard Palmer Q.C.**
**2, Temple Gardens,**
**London EC4Y 9AY.**
20 December 2020.