1

2

                    **UNITED STATES DISTRICT COURT**
                 **FOR THE EASTERN DISTRICT OF VIRGINIA**
                        **ALEXANDRIA DIVISION**

3

4
      CHARLOTTE CHARLES and          )
      TIM DUNN, Individually         )
      and as Co-Administrators       )   Civil No. 20-1052
5     of the ESTATE OF HARRY         )
      DUNN, and NIALL DUNN,          )
6     Individually,                  )
                                     )   Alexandria, Virginia
7             Plaintiffs,            )   February 3, 2021
                                     )
8        v.                          )
                                     )
9     ANNE SACOOLAS and              )
      JONATHAN SACOOLAS,             )
10                                   )
              Defendants.            )
11    _____       )

12

13                  **TRANSCRIPT OF MOTION HEARING**
                 **BEFORE THE HONORABLE T. S. ELLIS**
14                  **UNITED STATES DISTRICT JUDGE**

15               <u>**APPEARANCES**</u>:

16    **For the Plaintiffs:**      **Steven Jeffrey Toll, Esq.**
                                  **Agnieszka Maria Fryszman, Esq.**
17                                **Poorad Razavi, Esq.**
                                  **Leslie Mitchell Kroeger, Esq.**
18                                **Theodore Jon Leopold, Esq.**
                                  **Nicholas Jacques, Esq.**
19                                **Cohen Milstein Sellers &**
                                    **Toll PLLC (DC)**
20                                **1100 New York Ave, NW**
                                  **Suite 500, West Tower**
21                                **Washington, DC  20005**

22    **For the Defendants:**      **John D. McGavin, Esq.**
                                  **Bancroft, McGavin, Horvath &**
23                                  **Judkins, P.C.**
                                  **9990 Fairfax Boulevard**
24                                **Suite 400**
                                  **Fairfax, Virginia  22030**

25

2

1

2      **(Appearance page**
       **continued)**

3      **COURT Reporter:     PATRICIA A. KANESHIRO-MILLER, RMR, CRR**

4

5      **Proceedings reported by stenotype shorthand.**
       **Transcript produced by computer-aided transcription.**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                      P R O C E E D I N G S

 2                          (3:06 P.M.)

 3           THE COURT:  You may call the next matter, please.

 4           THE DEPUTY CLERK:  The Court calls civil matter

 5   Charlotte Charles, et al., versus Anne Sacoolas, et al. Case

 6   Number 20-CV-1052.

 7           May I have appearances please, first for the

 8   plaintiff.

 9           MR. TOLL:  Good afternoon, Your Honor.  For the

10   plaintiff, Steven Toll.  I would say it is nice to see you

11   again, but it is nice to hear your voice again.  With me is

12   my partner who will argue, Agnieszka Fryszman.

13           MS. FRYSZMAN:  Good afternoon, Your Honor.

14           THE COURT:  How do I pronounce your name,

15   Ms. Fryszman?

16           MS. FRYSZMAN:  Agnieszka Fryszman.

17           THE COURT:  So "Fryszman" is correct; is that right?

18           MS. FRYSZMAN:  Yes, sir.

19           THE COURT:  Thank you.

20           Who is on the line on behalf of the defendant?

21           MR. McGAVIN:  Good afternoon, Your Honor.  My name is

22   John McGavin, and I represent both defendants.

23           THE COURT:  All right.  And you will be arguing on

24   behalf of the defendants?

25           MR. McGAVIN:  Yes, I will, Your Honor.
```

4

1        THE COURT:  All right.  Now, the matter is before the

2   Court on a motion for dismissal pursuant to the doctrine of

3   *forum non conveniens* and also pursuant to a number of other

4   claims.  There's an 11-count complaint, some counts of which

5   the plaintiff has indicated an intention to withdraw -- I

6   think that's four of them, maybe five -- and there's a motion

7   to dismiss those.

8        In today's argument, I'm going to focus chiefly on

9   the motion for dismissal pursuant to the doctrine of

10   *forum non conveniens*, which the parties have fully briefed

11   and I think is now ripe for disposition.

12        So let me begin by giving the defendant -- that's

13   Mr. McGavin -- an opportunity.  Of course, I have read your

14   briefs.  In fact, I'm going to ask you a number of questions,

15   to begin with, Ms. Fryszman and Mr. McGavin.  Let me start

16   just generally by asking you some questions that I'm unclear

17   about regarding the facts.  All right.  And let me address

18   these to Mr. McGavin.

19        Mr. McGavin, as I understand it, this case arises

20   from a tragic, unfortunate accident that occurred in the

21   United Kingdom, and it was a collision between the defendant,

22   Ms. Sacoolas' car, and the motorcycle of the decedent, a

23   head-on collision.

24        Let me ask you, Mr. McGavin, as I understand it, the

25   defendant, Ms. Sacoolas, did not remain at the scene but left

5

1    the scene and did not call an ambulance but later someone

2    did.  The decedent, as I understand it, did not die instantly

3    but died later on.

4            Flesh out those facts for me, Mr. McGavin.

5            MR. McGAVIN:  Thank you, Your Honor.  This is John

6    McGavin, as we're asked to identify ourselves.

7            Your Honor, the facts as alleged in the complaint are

8    not completely accurate about what occurred after the

9    accident.  Ms. Sacoolas had her children in the vehicle, and

10   upon the occurrence of the accident, she checked on her

11   children and went to check on Mr. Dunn.  And about that time

12   another motorist arrived and called 9-1-1.  She did not flee

13   the scene of the accident; she stayed at the accident scene.

14   So that allegation is disputed and --

15           THE COURT:  How long did she stay at the scene of the

16   accident?

17           MR. McGAVIN:  She stayed until the rescue squad was

18   there, but I could not tell you precisely how long, but the

19   suggestion that she fled is just not true.

20           THE COURT:  Did she stay until the police came?

21           MR. McGAVIN:  Yes, Your Honor.  She spoke to the

22   police.  She told them the same thing that she has said, and

23   has accepted responsibility for the accident, and there is no

24   dispute on liability.  This is a quantum-only case.  So she

25   spoke to the police.  She admitted that she was on the wrong

6

1    side of the road and, in these proceedings, maintains that

2    same position.

3           THE COURT:  Why did she flee the United Kingdom?

4           MR. McGAVIN:  Well, the allegations that she fled the

5    United Kingdom are a bit overstated, in our view, Your Honor.

6    She came to the United States and did not participate in the

7    criminal prosecution, and that is what has caused a great

8    deal of local interest in the UK and has gotten a great deal

9    of publicity and a great deal of interest.  So her reasons --

10          THE COURT:  Why did she flee the United Kingdom?

11          MR. McGAVIN:  She returned to the United States after

12   some time, but she did not flee from the prosecution of those

13   charges.

14          THE COURT:  I don't understand that.  She did leave.

15   How soon after the accident did she return to the United

16   States?

17          MR. McGAVIN:  It was within a month or so after the

18   accident, Your Honor.

19          THE COURT:  Can you be more precise?  Was it within

20   days?

21          MR. McGAVIN:  Your Honor, my understanding is it was

22   approximately 30 days, but I don't know precisely the

23   timeline of when she did leave.

24          THE COURT:  I assume you talked to your client, so

25   you're confident it is about a month?

1      MR. McGAVIN:  I am, Your Honor.  That's my

2   understanding.

3      THE COURT:  I don't understand why she left.  Could

4   you explain that to me?

5      MR. McGAVIN:  Your Honor, I know that she was

6   consulting with counsel, and what those consultations were

7   and ultimately the decision to return to the United States I

8   do not know, and I'm not sure that -- I do not -- I cannot

9   answer that question in complete candor to the Court, Your

10   Honor.

11      What you're saying is you know the answer but you

12   can't disclose it?

13      MR. McGAVIN:  In part, Your Honor, that would be

14   true.

15      THE COURT:  Well, it's puzzling.

16      Let me ask this question of Ms. Fryszman:  Do you

17   know any facts of why she left the United Kingdom and when

18   she left?

19      MS. FRYSZMAN:  I do not, Your Honor.  I don't know

20   why she left.  I do know that she told the local police that

21   she would stay and cooperate with the investigation, but she

22   did not and she, instead, returned to the United States.

23      THE COURT:  Mr. McGavin, is Mrs. Sacoolas employed by

24   any department or agency of the United States?

25      MR. McGAVIN:  She has been, yes, Your Honor.

8

1          THE COURT:  I understand she may have been in the

2     past.  At the time of this accident, was she employed by any

3     department or agency of the United States?

4          MR. McGAVIN:  I believe that she was, Your Honor.

5          THE COURT:  All right.  Do you know what department

6     or agency of the United States?

7          MR. McGAVIN:  No, Your Honor.  That has not been

8     revealed to me.

9          THE COURT:  Do you know what department or agency of

10     the United States her husband was employed by?

11          MR. McGAVIN:  It is a matter that is -- the short

12     answer, Your Honor, I do not know the agency or the entity by

13     whom he is employed.  That has not been provided, and I do

14     think there are some issues there of security.  That's my

15     understanding.

16          THE COURT:  Are you saying that Mr. and Mrs. Sacoolas

17     were employed by an intelligence agency of the United States,

18     and that's why she left?

19          MR. McGAVIN:  I think that was a significant factor,

20     certainly, especially for Mr. Sacoolas.  The incident

21     occurred after they were at an Air Force base where

22     Mr. Sacoolas was working, and Ms. Sacoolas was -- had the

23     children there at the event and was driving the children

24     home.

25          THE COURT:  And what did Ms. Sacoolas do for the

1    department or agency of the United States for which she was

2    then employed?

3            MR. McGAVIN:  Your Honor, I do not have details of

4    what her specific roles or duties were.  I do not know that.

5            THE COURT:  Are you suggesting that's a matter of

6    security, as well?

7            MR. McGAVIN:  That is what I have been led to

8    believe, Your Honor, but I do not want to overstate that.

9    And if it's something that the Court would need in his

10   determination, I would press my client for more details.

11           THE COURT:  All right.  Tell me again, you said it

12   was about 30 days after the accident that she left the United

13   Kingdom; is that right?

14           MR. McGAVIN:  That is my rough understanding, Your

15   Honor, yes.

16           THE COURT:  I don't know where I had the impression

17   that she left fairly soon after the accident, but I guess I

18   am simply mistaken.

19           Now, your client, Mr. McGavin, she declines to return

20   to the United Kingdom; is that right?

21           MR. McGAVIN:  That's correct, Your Honor.

22           THE COURT:  Why does she decline to return to the

23   United Kingdom?

24           MR. McGAVIN:  Her fear is that, with the tremendous

25   media attention, that she will not receive -- or she's

1    concerned that she will not receive fair treatment both with

2    the press and the local community.  So she is fearful upon

3    the return, and concerned, and she's certainly apologetic and

4    accepts full responsibility for causing this accident and has

5    never denied it.

6         THE COURT:  Yes, but accepting full responsibility

7    doesn't mean you run away; it means that you stay there and

8    face it.  So I think you shouldn't overplay the "full

9    responsibility" card.

10         Now, let me ask you this:  If she won't return to the

11   United Kingdom, why in the world does that make the United

12   Kingdom the right place to litigate this case under the

13   *forum non conveniens* doctrine?

14         MR. McGAVIN:  There are a number of reasons, Your

15   Honor, and they go in part to what the Court might ultimately

16   do with the nature of the plaintiffs' claims.  But in the

17   claims that we anticipate will survive, there is a claim

18   under the LRA for the pain and suffering of the deceased

19   before his death.  And there will be medical providers, there

20   will be EMTs, there will be the motorist who came up on the

21   scene shortly after the accident, there will be healthcare

22   professionals who would be witnesses who will be available to

23   receive process in the UK and provide that evidence.  In

24   addition, Mr. Dunn, the father, has a claim in his own right

25   for having come up on the scene and found his son in distress

1   and seeing him suffer, and he makes a claim for emotional

2   distress.  That's not a bereavement claim or a solace claim,

3   which is not permitted under the law of the UK, but it is a

4   claim under which severe medical -- medical or emotional --

5   mental or emotional distress can be tested by healthcare

6   professionals, and that would be in the UK.

7           In addition, Your Honor, under the Fatal Accident

8   Act, the plaintiff is claiming pecuniary loss, loss of

9   services.  And as the deceased was 19 years old, emancipated,

10  he does not leave a surviving spouse or children, then for

11  the mother and father and surviving brother, the question

12  will become what pecuniary services he was providing and

13  whether that is lost income or services in kind.  Those will

14  have to be fully tested as the quantum of any damages that

15  the Court will award is evaluated.  So those things are

16  uniquely available, those witnesses and that evidence, the

17  school records or employment records or evidence of payment,

18  those things are uniquely within the UK, and not in the

19  United States, where obviously Mr. Dunn lived and worked and

20  went about his school activities or other things that he was

21  engaged in in the UK.  So that evidence is uniquely there in

22  the UK.

23          Ms. Sacoolas doesn't add or provide much to setting

24  that quantum of damages as to what is the emotional distress

25  suffered by Mr. Dunn after his injury and his suffering until

12

1   he died, Mr. Tim Dunn's claim for his emotional distress, and

2   then evaluation of those pecuniary damages.  So there are a

3   number of reasons why that evidence will be far easier to

4   develop, far easier to subpoena, far easier to present in the

5   UK.

6           As to public interest, there is enormous public

7   interest in this case in the UK, as evidenced by the

8   tremendous amount of media attention and the interest that

9   has gone all the way up to the Prime Minister, who has

10  expressed some interest in this case.  So, obviously, there

11  is a tremendous interest there.

12          Plus, the law in the UK on this is very -- on a

13  wrongful death action of this kind -- is very different than

14  what we have in the United States.  It is very nuanced.  And

15  we have expert -- competing expert reports that help explain

16  it to us.  But it is a very different application of the law.

17  Certainly, Your Honor can interpret it, but it is nuanced and

18  it is different, and it would be likely interpreted perhaps

19  differently than here.  That's good or bad different law, it

20  doesn't preclude the case being dismissed on this motion, but

21  it certainly is an important factor in the Court exercising

22  its discretion.

23          So for these reasons --

24          THE COURT:  What -- go ahead.  "For these reasons,"

25  go ahead, sir.

1          MR. McGAVIN:  Thank you, Your Honor.

2          I was going to say, for these reasons, we believe

3    that the motion should be granted.

4          THE COURT:  All right.  Ms. Fryszman, you may respond

5    now.

6          MS. FRYSZMAN:  Your Honor, no case has been cited to

7    you -- and I know of no case -- where any court has dismissed

8    on *forum non conveniens* grounds in favor of the jurisdiction

9    where the defendant has stated that they will not appear.

10   There is no precedent that I know of for such a dismissal.

11         The plaintiffs in this case filed here in the Eastern

12   District of Virginia because this was the only place where

13   they could obtain personal jurisdiction over the defendant.

14   It is the defendant's --

15         THE COURT:  Ms. Fryszman, could I ask you to speak a

16   little louder, please.

17         MS. FRYSZMAN:  Yes.

18         THE COURT:  Go ahead.

19         MS. FRYSZMAN:  There is Fourth Circuit precedent that

20   says that when a plaintiff, even a foreign plaintiff, files

21   in the defendant's home that that choice is entitled to

22   deference.  To prevail, the defendants must show that this

23   forum is vexatious and oppressive and that the public and

24   private interests strongly favor transfer, and this they

25   cannot do.

1          And I will take the witness arguments first.  It is

2     our view that Anne Sacoolas is a necessary and key witness.

3     She is the only witness to Harry's pain and suffering as he

4     lay on the ground after the accident during the time period

5     from when the accident occurred to the time period when the

6     first responders arrived, which in our understanding that was

7     quite a long period.  So she is going to be a key witness as

8     to damages.  And the Fourth Circuit, in *DiFederico v.*

9     *Marriott*, held that that was a reason to deny

10    *forum non conveniens* transfer, in that case where a key

11    damages witness couldn't go to the foreign court.  So on that

12    basis alone, I think transfer is inappropriate.  She would be

13    a key witness on damages, and she is also a key witness on

14    the merits.

15          One of the negligence claims is that she did not call

16    for help and did not call the police when she had a duty to

17    do so after having caused the accident.  Although the

18    defendants say that they have admitted full responsibility

19    that she was driving on the wrong side of the road, they

20    haven't spoken to that part of the negligence claim.  And

21    there is also the vicarious liability claim, and both Mr. And

22    Mrs. Sacoolas will be witnesses in that claim.  So it is our

23    view that they will be needed at trial, and they refused to

24    appear, and the defendants have not met their burden showing

25    that a trial could go forward at all in the United Kingdom

1    when the defendants refuse to appear and refuse to testify in

2    person.

3         As to the private factor, the witnesses are really

4    the only private factor that has been raised, and that factor

5    definitely favors keeping the case in the Eastern District of

6    Virginia, where the defendants are and where they are able to

7    participate in person.  The defendants haven't raised any of

8    the other private factors.  So that factor (indiscernible)

9    maintaining the case in the Eastern District of Virginia.

10        As to the public factors, the defendants have raised

11   the views of the United Kingdom.  The United Kingdom strongly

12   supports the suit going forward in the Eastern District of

13   Virginia.  We have put in a letter from the Foreign Secretary

14   of the United Kingdom that states -- I quote Exhibit 6 -- it

15   says, "The British government takes the view that citizens

16   can bring their case in whichever court they think

17   appropriate" -- here, in the Eastern District of Virginia --

18   "and the British government has confidence in the ability of

19   this Court to hear the case and that the Foreign Secretary

20   hopes that the action will be able to proceed here."  The

21   United Kingdom's interest is in the case proceeding in the

22   Eastern District of Virginia.

23        THE COURT:  Why wouldn't the United Kingdom's

24   interest first and foremost be to pursue it in the United

25   Kingdom with the presence of Ms. Sacoolas if she waives her

16

1    immunity from civil liability?

2         MS. FRYSZMAN:  Ms. Sacoolas, in their papers, they

3    have said that she refuses to return and will not return.

4         THE COURT:  I understand that.  But what I'm saying

5    is why isn't it in the best interests of the United Kingdom

6    to hear this matter in the United Kingdom, provided

7    Ms. Sacoolas agrees to come back?  I understand she hasn't

8    agreed to come back.  But I assume you and your clients would

9    prefer to have this case in the United Kingdom if

10   Ms. Sacoolas and her husband were to return and waive their

11   immunity.  Isn't that right?

12        MS. FRYSZMAN:  I would need to check with our

13   clients, but it is my understanding that she vehemently

14   opposes returning; that the British government, as recently

15   as this weekend, asked the Biden Administration to review the

16   decision not to extradite, and they were refused.  So I think

17   that is just not in the cards, Your Honor.  They have said in

18   their papers that they won't return, and the United States

19   government has said that they won't review the decision not

20   to extradite.

21        THE COURT:  Are you telling me that the Biden

22   Administration refuses to change the decision of the Trump

23   Administration in this regard?

24        MS. FRYSZMAN:  That is my understanding, that they're

25   not going to go back and re-review it.

17

```
1          THE COURT:  All right.  I just wanted that clarified;

2     that the Biden Administration agrees with the Trump

3     Administration on this point.

4          Go ahead.

5          MS. FRYSZMAN:  I think what they said was they

6     wouldn't re-review it, so the decision is going to just stand

7     as it was.

8          But as to the other witnesses that defendant has

9     mentioned, we have put in affidavits from the other

10    witnesses, and they're all willing to come to the Eastern

11    District of Virginia live and in person.  So this isn't a

12    case where -- you know, the defendants have put forth no

13    information and no evidence that any witness is refusing to

14    come here.  So all the witnesses that we know about are

15    willing to come here live and in person in the Eastern

16    District of Virginia, and the opposite is true of the United

17    Kingdom.

18         And as to the conflict of laws, I guess I agree with

19    the defendants, it's going to be British law.  We share a

20    common legal tradition.  Everybody agrees that the Court is

21    well equipped and capable of applying British law.  It's in

22    English, it is a lot like our law.  And that Virginia also

23    has a local interest in the DiFederico case.  Again, the

24    Fourth Circuit says local courts have an interest in the

25    conduct of their own citizens, particularly diplomats who are
```

1    representing the United States overseas (indiscernible)

2    citizens may wish to sue someone in the United Kingdom, and

3    we would want their courts to be receptive to our own

4    citizens.

5         THE COURT:  All right.  I'm going to recess this

6    matter briefly while I consider whether I have any questions

7    for you on the *forum non conveniens* issue, and so I will

8    leave the hearing at this time, recess it.

9         Tanya, you can shift me to the breakout room.

10        THE DEPUTY CLERK:  Yes, Judge.

11        MR. McGAVIN:  Judge Ellis, I'm sorry to interrupt.  I

12   do have some more information, checking my notes, that could

13   answer in a bit more detail a couple of your questions if you

14   would permit me.

15        THE COURT:  Yes, of course, you go ahead.

16        MR. McGAVIN:  Thank you, sir.

17        I have clarified with one of my colleagues who is

18   assisting Ms. Sacoolas that Ms. Sacoolas was employed by the

19   State Department and that the State Department asserted

20   diplomatic immunity and re-called her.  So that was a factor

21   in her leaving.  I wanted to answer that question more

22   directly.

23        Secondly, Your Honor, I do want to confirm, in

24   checking my notes, that Ms. Sacoolas, immediately after the

25   accident, did go to Mr. Dunn.  And as she realized he was in

19

1    distress, a motorist came by, she flagged that motorist down,

2    and then made the call.  She did not leave until the UK

3    police released her.  So she stayed until release by the

4    police.  So those --

5         THE COURT:  Didn't she assure the police that she

6    would be there and available to investigate the matter in the

7    future?

8         MR. McGAVIN:  She did, and she also spoke to the

9    police in a subsequent meeting and did admit, as before.  But

10   as I say, it was the U.S. that asserted the diplomatic

11   immunity, and they re-called her.

12        THE COURT:  Who re-called her?

13        MR. McGAVIN:  The State Department.

14        THE COURT:  Did she work for the State Department or

15   some other agency?

16        MR. McGAVIN:  My understanding from my colleague, in

17   checking these notes, Your Honor, is that she worked for the

18   State Department, and that is also from information that she

19   has provided.

20        THE COURT:  So you're telling me that she was a State

21   Department employee, and that's not a cover job or anything

22   like that?

23        MR. McGAVIN:  I don't know that, and I do not want to

24   mislead the Court in any way on that.  I would have to find

25   out, to answer that correctly.

1        THE COURT:  But she's not, as I understand it, a

2   foreign service officer.

3        MR. McGAVIN:  She is waiving diplomatic immunity,

4   Your Honor, as evidenced by her affidavit.

5        THE COURT:  She is waiving her diplomatic immunity?

6        MR. McGAVIN:  Yes.  That's in her affidavit.

7        THE COURT:  And so if she went back -- what she is

8   not waiving is her immunity from civil and criminal

9   prosecution in the United Kingdom; is that right?

10        MR. McGAVIN:  Not civil, Your Honor.  As I take what

11   you mean, the consequences of a civil proceeding, meaning

12   that this lawsuit, she is not -- she is -- she is consenting

13   to service and accepting service of a civil action in the UK.

14   But she is not returning for purposes of the criminal

15   proceedings, no.

16        THE COURT:  All right.  Anything else you want to

17   tell me, Mr. McGavin?

18        MR. McGAVIN:  No.  Thank you, Your Honor.  Thank you

19   for allowing me to provide that additional information.

20        THE COURT:  I may have additional questions.

21        Remove me to the breakout session, Tanya.

22        THE DEPUTY CLERK:  Yes, Judge.

23        (Recess taken)

24        THE COURT:  All right.  I have a few more questions,

25   if I may.

21

 1          Mr. McGavin, I've looked a little more carefully.

 2     Your statement that she remained in the UK for 30 days is off

 3     by a factor of about 2.  I think it is 18 days, from what I

 4     can tell, and it may be sooner.  I don't know.

 5          MR. McGAVIN:  I'm sorry, Your Honor.  This is John

 6     McGavin.  I have checked on that, and I'm corrected.  I'm

 7     told it was about 3 weeks.  I wanted to fact check myself

 8     during our recess, and that's the information that I have.

 9          THE COURT:  18 days.

10          MR. McGAVIN:  It could be 18.  I was -- I thought it

11     was a bit more, as much as 3 weeks, but I'm not going to

12     argue that point, Your Honor.

13          THE COURT:  All right.  And let me ask, also,

14     Mr. McGavin:  I have an understanding -- imperfect, to be

15     sure -- that Ms. Sacoolas and one of the children was in the

16     car that struck the decedent.  Mr. Sacoolas and the other

17     child were in another automobile somewhere up ahead.  Is that

18     your understanding?

19          MR. McGAVIN:  I did not understand that to be true,

20     but I don't know, and I don't want to misstate that record.

21     She definitely had one of --

22          THE COURT:  You could --

23          MR. McGAVIN:  I'm sorry?

24          THE COURT:  -- how far ahead Mr. Sacoolas was of

25     Ms. Sacoolas and whether he stopped for the accident?

22

1           MR. McGAVIN:  I do not believe that Mr. Sacoolas was

2    at the scene of the accident, Your Honor.  What I

3    understand --

4           THE COURT:  I'm saying you couldn't tell me how far

5    ahead he was, if he was ahead, and whether he stopped; all

6    you can tell me is your information is he wasn't at any time

7    at the scene?

8           MR. McGAVIN:  That's correct, Your Honor.

9           THE COURT:  All right.  Do you have any information

10    on that, Ms. Fryszman?

11           MS. FRYSZMAN:  I do not, Your Honor.  I only have

12    what we've pled in the complaint.

13           THE COURT:  Are you aware, Ms. Fryszman, that there's

14    some indication that he was driving up ahead of her -- I

15    don't know -- it could have been miles ahead, it could have

16    been 10 feet ahead -- with the other child?

17           MS. FRYSZMAN:  I read a wide range of newspaper

18    stories, and I just -- I don't know what the facts actually

19    are, Your Honor.

20           THE COURT:  All right.  Back to the

21    *forum non conveniens* issue for just a moment.  I understand

22    that she concedes that she was negligent.  Of course, if the

23    matter remains here, she would be deposed, and I take it she

24    could be deposed here even if the matter were sent back to

25    the United Kingdom; isn't that right?

```
 1            MR. McGAVIN:  This is John McGavin, Your Honor.  I
 2     think that is right.
 3            MS. FRYSZMAN:  I believe that's right, but if there
 4     were to be a trial, the plaintiffs, of course, would like to
 5     put her on live, as we would want all the witnesses to be
 6     live.
 7            THE COURT:  Well, of course, you can issue a subpoena
 8     if it's here and she will appear live.
 9            MS. FRYSZMAN:  Yes.
10            THE COURT:  Let's see, I had another question.
11            I understand, Mr. McGavin, you argued that all of
12     those witnesses who were at the scene of the accident and
13     could testify about the pain and suffering that the decedent
14     suffered following the accident, that they're all in England.
15     What do you say to the fact that it appears that those
16     witnesses have been identified and have all declared their
17     willingness to travel to the United States for this case?
18            MR. McGAVIN:  Your Honor, there's a key witness here
19     that is not identified in the materials by either side, who
20     is the female motorist that Ms. Sacoolas flagged down within
21     a very short time, no more than a minute or two is my
22     understanding, after the incident, because she went to aid
23     Mr. Dunn and could see that he was in great distress.  She
24     had a child or two in the car -- I'm not sure of that -- and
25     then flagged down this motorist.  And she was in great shock
```

24

1    and upset and felt terrible, and the motorist is the one who

2    made the call.  That motorist is a very important witness to

3    dispel some of these statements that are made, and I do not

4    have her name, and she is not -- I know that she is not

5    listed in the affidavits that have been submitted by the

6    plaintiffs, Your Honor.  That is a very important witness to

7    dispel --

8              THE COURT:  Well, if you don't know her name, how do

9    you know it isn't one of the witnesses that are in the

10   affidavits?

11             MR. McGAVIN:  Because it is a female, Your Honor,

12   it's a layperson, and what they have identified is an EMT,

13   along with the family.  So this is a lay witness female.

14             THE COURT:  What's her name?

15             MR. McGAVIN:  I don't know her name, Your Honor.

16             THE COURT:  Did you ask Mrs. Sacoolas?

17             MR. McGAVIN:  In my information from Ms. Sacoolas, I

18   have not secured her name or I don't have her name.

19             THE COURT:  Well, you just told me about a witness

20   you think would be very favorable to your side, but you can't

21   tell me the name of that witness.  Does that strike you as

22   odd?

23             MR. McGAVIN:  I think it is something that I should

24   know and, unfortunately, I do not.  I hope it's not odd, but

25   I wish I was able to quote that to you, Your Honor.

25

1          THE COURT:  Well, it is odd.  You told me there's a

2     witness who can dispute some of the things that the plaintiff

3     is alleging, but you can't tell me who that witness is.  So

4     what you're saying is that is an important witness and the

5     plaintiff has not shown that that witness would come to the

6     United States.

7          MR. McGAVIN:  Yes.

8          THE COURT:  So I don't even know if that witness

9     would be available in England if no one knows that witness'

10    name.

11         MR. McGAVIN:  Ms. Sacoolas does not know her name.

12    In looking at my notes, I see that she does not know the name

13    of it, and it is not in the information that I have obtained

14    from her.

15         THE COURT:  Well, then, how in the world does that

16    matter here if nobody knows her name?  She won't appear in

17    England, either.

18         MR. McGAVIN:  I understand that it is in and part of

19    the police investigation of this matter.

20         THE COURT:  All right.  So when the police find out

21    the identity of this person, then we can ascertain whether

22    that person would be willing to come to the United States if

23    the case remains here.

24         MR. McGAVIN:  That's correct, obviously, yes.

25         THE COURT:  All right.  You indicated, also, I think,

1    Ms. Fryszman, that the UK has indicated support for plaintiff

2    bringing the case in the United States.  You don't mean to

3    suggest that the UK is opposed to having the matter fully

4    litigated in the United Kingdom, with all of the interested

5    parties there, including the defendants?

6          MS. FRYSZMAN:  No, I'm saying that the private

7    factors, one of which is the interest of the locality, all

8    favor the Eastern District of Virginia.  And the defendants

9    cannot --

10         THE COURT:  That's a public factor.

11         MS. FRYSZMAN:  Sorry.  I misspoke, Your Honor.  It's

12   a public factor, yes.  The defendants can't show that the

13   public strongly favors transfer because the United Kingdom

14   has indicated that they support maintaining the suit here in

15   the Eastern District.  So all of the other factors favor the

16   Eastern District of Virginia, and they would have to strongly

17   favor the United Kingdom in order for transfer to be

18   appropriate.

19         If I might add, as to the anonymous and missing

20   witness, the caselaw is a hundred percent clear that the

21   defendants would have to come forward with evidence of a

22   witness as noncumulative testimony and an affidavit saying

23   that he or she would not come here.  They haven't done that.

24   They have not met their burden on that mystery witness.

25         THE COURT:  All right.  And the argument about the

27

 1      application of American law -- or English law, rather -- not

 2      American law -- let me be clear about that -- it is not

 3      surprising or unusual for a Federal Court in Virginia to

 4      interpret the law of other states which may be different from

 5      the law of Virginia, as the law of the United Kingdom is from

 6      Virginia law.  And that's not a problem.  That's what judges

 7      do.  And then they fashion appropriate applicable

 8      instructions.  Now, the jury is unfamiliar with both American

 9      and English law, so I don't know that it makes any difference

10      there.

11            Mr. McGavin, tell me why you think the application of

12      English law militates in favor of a dismissal on

13      *forum non conveniens* grounds given what I just said.

14            MR. McGAVIN:  I have no doubt, Your Honor, that you

15      can interpret and read the materials and understand the law.

16      But it is so summarily different in terms of how it is

17      interpreted in the UK.  For example, Your Honor, in the

18      United States, insurance companies issue policies of

19      insurance that have limits, $50,000, $100,000 policies.  The

20      insurance policies in the UK, that is a foreign concept for

21      them.  They don't have limits, and part of that is because of

22      how these tragedies are interpreted under their law and how

23      they narrowly construe bereavement laws and solace and these

24      issues of what's a dependency or a pecuniary loss.  So it is

25      quite narrow and quite restricted.  And it is a very

28

1     different application, which although --

2          THE COURT:  Isn't that what you say I'm competent to

3     understand and to instruct the jury on?

4          MR. McGAVIN:  To a point, Your Honor.  It's one thing

5     for the scholars to read the law; it's another to actually,

6     as I say in the world of trial work, make the sausage, so to

7     speak, to actually see how it is applied.  And it is a little

8     different.  And that's why I think that the expert statements

9     that we've submitted from Mr. Palmer, which outline the very

10    limited interpretations that are applicable under UK law, are

11    very foreign to us in a wrongful death action where we have

12    the concepts of bereavement and solace and loss of kindly

13    offices, those elements that are unique to at least Virginia

14    statutory scheme for wrongful death awards.

15         THE COURT:  What is it you think I can't understand

16    as a judge about that?

17         MR. McGAVIN:  I think what will be hard for the Court

18    is to understand just how restrictive the awards are and how

19    narrow their interpretations of the --

20         THE COURT:  Well, I might not agree with it, but that

21    doesn't mean I can't understand it and apply it.  Whether I

22    agree with English law or not is totally irrelevant,

23    completely irrelevant.  Any reason why you think I can't

24    understand it and apply it?

25         MR. McGAVIN:  Well, I know you can understand it.

29

1          THE COURT:  Of course I can.  It's in English; isn't

2     it?  And the opinions are in English.

3          MR. McGAVIN:  They are in the King's English, yes,

4     Your Honor.

5          THE COURT:  All right.  And actually I have some

6     experience in legal education in England.  Of course, any

7     American judge can understand it and apply it, and the jury

8     doesn't know any different, whether they would be in England

9     or the United States.  They have to listen to what a judge

10    says and apply it.  I'm not moved much by that, I can tell

11    you that.  I think that yes, it's unfamiliar, but it's in

12    English, the cases are in English.  I can understand it, and

13    I'm bound by it, and I will apply it in instructions.  But I

14    don't think it's an important factor.  I think it is

15    appropriate for you to raise it as a factor, but I don't

16    think it is a decisive one.  The private factors I think you

17    all have told me about.

18         Is there anything more about the private factors that

19    you want to add, Mr. McGavin?  And then I will ask you,

20    Ms. Fryszman.

21         MR. McGAVIN:  Yes, Your Honor.  The police

22    investigation, which will include the name of this witness,

23    who, as I get information from one of my colleagues by

24    e-mail, is Jennifer Hewett (phonetic), is this witness' name,

25    but I don't have an address or contact information for her.

1    But that police investigation, that information will be

2    important to us, and that of course will be something that is

3    subject to far easier a subpoena in the UK and obtaining that

4    information in the UK than it will be in the U.S.  So I would

5    add that additional information in trying to give the Court

6    full answers to the questions that you've asked.

7         THE COURT:  You really think so?  Do you know about

8    depositions in the United Kingdom, Mr. McGavin?

9         MR. McGAVIN:  No, Your Honor.  I'm not a -- I'm not

10   a -- I'm not.

11        THE COURT:  I'm an old man, Mr. McGavin, and I go

12   back a long ways.  Many years ago, before I was a judge, I

13   was a lawyer litigating antitrust cases in Europe, including

14   the United Kingdom.  It's totally irrelevant to what's before

15   me today.  But I tried to take the deposition of people in

16   France and Switzerland, and I almost got put in jail for

17   trying that.  Taking depositions in Europe is far different

18   from taking depositions here.

19        But anyway, we shall see.  I will consider what you

20   have said.

21        How about public factors?

22        Well, let me ask Ms. Fryszman, do you have anything

23   more on private factors?

24        MS. FRYSZMAN:  Only that they have only raised the

25   issue of witnesses, they have not raised any of the other

1  private factors.  As to this witness, no one has put in

2  anything before Your Honor to indicates that this witness

3  wouldn't be willing to come here and wouldn't be willing to

4  (indiscernible).

5       THE COURT:  Well, perhaps you now have the name of

6  that witness.  I don't know what other information you're

7  getting by e-mail, Mr. McGavin.  If you have more that you

8  want to tell me, by all means do so, or else the person who

9  is giving you that information can produce himself or

10  herself, and I will hear from them if they're counsel for the

11  defendants.

12       But you have the name of that person, Ms. Fryszman,

13  and now you can pursue that.

14       Now, let's go to the private factors.  Mr. McGavin,

15  do you have anything more to tell me about the private

16  factors?

17       MR. McGAVIN:  I'm checking my notes, Your Honor.

18  Thank you.

19       I think I have discussed the local interest, which I

20  think is quite strong, obviously, in the UK as evidence by

21  the attachments that have been submitted on behalf of the

22  plaintiff.  There seems to be an extraordinary local interest

23  in having this matter litigated and decided.  And the

24  attachment from -- or the letter suggesting there is no

25  opposition to this going forward in the U.S. is not quite the

1    same as saying that the British government has endorsed this

2    case being taken by this Court to be decided.  I think they

3    defer, Your Honor, to your sound judgment.

4         As to court congestion, obviously the Eastern

5    District of Virginia will move expeditiously.  That's not an

6    issue.  But we also understand that, in the UK, because of

7    their procedures where they go into ADR, as this is a

8    damages-only case, it is our understanding from Mr. Palmer,

9    who provided our expert report, that would move

10   expeditiously.  So there is no difference so much there.

11        And I mentioned, of course, the Court not being

12   completely at home with this law.  No other public interest

13   issues I can -- I believe that are applicable or will impact

14   on the Court's decision other than those I have already

15   cited.

16        Thank you.

17        THE COURT:  Refresh my recollection, if you would,

18   please.  Is Mr. Palmer a barrister, solicitor, or academic?

19        MR. McGAVIN:  All right.  I believe he is a

20   barrister.  I'm checking.  I believe that's right.  I think

21   he is not only -- yes, he is a barrister of the English Bar

22   and Queen's Counsel, called to the bar in 1977.

23        THE COURT:  All right.  Thank you.  All right.

24        Anything more on public factors, Ms. Fryszman?

25        MS. FRYSZMAN:  Yes, Your Honor.  I just wanted to

33

1    reiterate that the closing line of the letter from the

2    British Foreign Secretary is, "I hope, therefore, your action

3    in the United States is able to proceed."  It's not quite as

4    neutral as Mr. McGavin would have you believe.  It is clearly

5    a statement of support for the parents and for the action to

6    proceed in the Eastern District of Virginia (indiscernible).

7         As to the barrister, one of the issues that the

8    barrister -- the defendant's expert did not address at all --

9         THE COURT:  I'm sorry.  Say that again.  I can't hear

10   you, Ms. Fryszman.

11        MS. FRYSZMAN:  One of the issues that the barrister

12   for the defendants did not address at all is whether the case

13   can, in fact, go forward remotely.  Our expert, who is also a

14   barrister, said that British courts don't go forward

15   remotely, and the defendants would need to be present.  And

16   as you know, the defendants are refusing to return to the

17   United Kingdom for trial or for any proceedings.  And it is

18   the view of our barrister that the court wouldn't proceed in

19   that manner.  So the defendants haven't, in fact, shown that

20   it is an available or adequate forum because they didn't put

21   in any evidence that the Court could, in fact, proceed if the

22   defendants don't turn up in the United Kingdom.

23        THE COURT:  All right.  I'm going to go into a

24   breakout session one last time, and then I will return and

25   tell you how I intend to proceed.

34

1           Tanya, could you remove me to a breakout session,

2     please.

3           THE DEPUTY CLERK:  Yes, Judge.

4           (Recess taken)

5           THE COURT:  All right.  Ms. Fryszman, Mr. McGavin,

6     thank you for your arguments.  They were helpful, and your

7     briefs, as well, and I will review them thoroughly.  I'm

8     going to decide this issue promptly and not go on today to

9     the other issues, but I will schedule a hearing for the other

10    issues on the possibility that I will deny the motion for

11    *forum non conveniens*, and then I will hear these matters.

12    But I'm going to decide the motion to dismiss on

13    *forum non conveniens* grounds first, and then I will proceed

14    on February the 17th, at 3 p.m., in the event that I deny the

15    motion to dismiss on *forum non conveniens* grounds, and on

16    that date, I will hear argument on the remaining issues on

17    the motion to dismiss.

18          All right.  I thank counsel again for your arguments.

19          I will point out one thing.  I think it was

20    Mr. McGavin who said this.  Mr. McGavin, you said something

21    about the King's English.  You're wrong.  It is the Queen's

22    English.

23          MR. McGAVIN:  Your Honor, I'm wondering if during

24    your service in the -- I think it was the Navy -- if you were

25    stationed over there and learned some of that English.  I

1    don't know.

2            THE COURT:  No, I was stationed on aircraft carriers,

3    not on the ground.  But my time in England was as a student

4    and, later on, in a sabbatical, and so my view is it's the

5    Queen's English, and long may she reign.

6            MR. McGAVIN:  Well, thank you, Your Honor.  If my

7    wife, who is quite a lover of the PBS British shows, hears

8    that I made that mistake, I'm sure she will equally point out

9    to me that I was incorrect.

10            THE COURT:  All right.  I thank counsel for your

11   cooperation and your arguments.  They were, indeed, helpful.

12            It is an important issue.  All issues are important

13   to the parties that are making them, and I remind myself

14   every time of that, and I will give it careful consideration

15   and issue a decision in advance of the February date that I

16   have set for further arguments.  And at that time, depending

17   on the decision I make on the *forum non conveniens* motion,

18   that further argument will need to be canceled or will

19   proceed.

20            Any questions, Ms. Fryszman?

21            MS. FRYSZMAN:  No, Your Honor.

22            THE COURT:  Mr. McGavin?

23            MR. McGAVIN:  Just confirming the date, Your Honor.

24   I was trying to write it down quickly.  Did you say

25   February 17, at 3 p.m.?

1              THE COURT:  Yes, sir.

2              MR. McGAVIN:  Thank you.  Nothing else.  Thank you,

3      Your Honor.

4              THE COURT:  I thank counsel again.  The court stands

5      in recess.

6                  (Proceedings adjourned at 4:11 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Patricia A. Kaneshiro-Miller, certify that the

4       foregoing is a correct transcript from the record of

5       proceedings in the above-entitled matter.

6

7

8       /s/ Patricia A. Kaneshiro-Miller        February 5, 2021
        ------------------------------------    ---------------------
9       PATRICIA A. KANESHIRO-MILLER                   DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```