# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CHARLOTTE CHARLES and TIM DUNN, Individually and as Co-Administrators of the. ESTATE OF HARRY DUNN, and NIALL DUNN, Individually, <br><br>　　　　　Plaintiffs, <br><br>　　v. <br><br>ANNE SACOOLAS and JONATHAN SACOOLAS, <br><br>　　　　　Defendants. | Case No. 1:20-cv-01052 |

### DECLARATION OF STUART JOHN BLACKWOOD

1. My name is Stuart Blackwood, care of ARC Investigations Limited, PO Box 12908, Lasswade, EH19 9AN, United Kingdom.

2. Since April 2019, I have been a Director and Principal Consultant of ARC Investigations Ltd, based near Edinburgh, Scotland.

3. I have been retained by the Washington, D.C. law firm Levy Firestone Muse to assist in the investigation into the circumstances of the August 27, 2019, accident which resulted in the death of Harry Dunn. I understand this declaration is to be filed in the above captioned case.

4. I have nearly 30 years of experience as an accident reconstructionist and expert collision investigator. I attach a copy of my Curriculum Vitae (CV).

5. Prior to establishing ARC Investigations Ltd, I was a police officer for over twenty-three years, with the last ten of those spent as a full-time collision investigator and reconstructionist. I thereafter spent seven years assigned as the Principal Consultant and Manager at the UK's Transport Research Laboratory (TRL).

6. I have a Master of Science degree with distinction in Forensic Collision Investigation, along with numerous other related qualifications.

7. I am currently a Technical Assessor for UKAS (United Kingdom Accreditation Service), which assesses the technical competence and suitability of police collision investigators throughout the United Kingdom.

8. I have been requested to provide this Declaration in relation to the police investigation relating to the mobile phone of Anne Sacoolas.

9. The facts outlined in this Declaration were established during my investigation and review of various documents currently available in relation to this case. This includes the attached statement of Detective Inspector Louise Hemingway, dated March 6, 2020.

10. It appears undisputed from the currently disclosed available evidence that the Defendant, Anne Sacoolas, was driving on the incorrect side of the road and that this resulted in a head on collision with the deceased, Harry Dunn, who was riding his motorcycle in the correct lane. Following my initial investigations, this is a synopsis with which I concur.

11. As in all such cases, the UK police initiated an investigation to determine the circumstances of the accident and any factors that might have contributed to it. This should have included an inquiry as to why Anne Sacoolas was driving on the wrong side of the road.

12. The investigation commenced the night of the accident and involved a number of police officers from Northamptonshire Police.

13. At the scene, officers obtained basic information to identify persons involved, including Anne Sacoolas, and any non-involved potential witnesses.

14. One of those officers administered a breathalyser test to Anne Sacoolas at the scene, the results of which were recorded as negative for alcohol. By necessity, this test is standard practice in all road traffic collisions, such as this case. It was conducted a short time after the collision and on that evening, as any potential alcohol consumed by Anne Sacoolas would degrade with time and potentially result in a loss of evidence.

15. The police then allowed Anne Sacoolas to go home, advising her that there would be an investigation and that investigators would be in contact with her. This practice is not unusual.

16. The next day, August 28, 2019, Northamptonshire Police Serious Collision Investigation Team investigators, including DI Louise Hemingway, met with Anne Sacoolas at her home. They served her with a notice letter informing her that she was the subject of a criminal investigation and that they would be taking an interview of her under caution.

17. This letter and the information contained therein, are consistent with normal police protocols involving traffic fatalities. It informs the suspect that the criminal investigation is ongoing.

18. At the meeting on August 28, 2019, the investigators asked Anne Sacoolas if she had any plans to leave the United Kingdom. Anne Sacoolas told them her family only arrived a few weeks earlier and would be staying in the United Kingdom for three years. Thus, she made it clear to the police that she would be available for an interview and other follow-up investigation.

19. Later that same day, the investigators were informed that the United States Government was claiming diplomatic immunity for Anne Sacoolas. Upon learning that diplomatic immunity was involved, the investigators promptly submitted the required paperwork to apply for a waiver of immunity for Anne Sacoolas, which would allow them to properly pursue a criminal investigation. Similar paperwork was filed to allow the investigators to interview her husband, Jonathan Sacoolas, and their young son, who was in the car at the time of the accident.

20. These actions demonstrate that the investigators were actively pursuing a criminal investigation and fully expected to have an opportunity to speak with Anne Sacoolas and other witnesses, including family members. This would have included the opportunity to take her mobile phone with a view to conducting a full examination of it.

21. Contrary to her assertions and the expectations of the police, Anne Sacoolas and her family left the United Kingdom on Sunday, September 15, 2019.

22. The investigation team did not learn that Anne Sacoolas had left the country and returned to the US until the following day, September 16, 2019.

23. At the time Anne Sacoolas departed, it appears she took her mobile phone with her.

24. An examination of the driver's mobile phone to determine if it was a factor in the collision causation is consistent with well-established UK standards for fatal collision investigations and comports with the Serious Collision Investigation Team investigators' stated intention to thoroughly investigate and identify all the factors involved in the collision.

25. The forensic examination of a driver's mobile phone requires that the police take custody of the phone and submit it for a forensic examination by a suitably qualified individual. The seizure of the phone is authorised by the Police and Criminal Evidence Act (PACE) 1984 as amended and often effectively deprives the owner of use of that phone for an extended period while the examination is conducted.

26. The examination of the driver's mobile phone is particularly relevant in cases, such as in this instance, where there are no apparent extenuating factors leading to the collision such as drug or alcohol impairment, actions of other parties, road obstacles, etc.

27. The investigation procedure of fatal road traffic collisions is outlined in the College of Policing publication titled "*Investigation of fatal and serious injury road collisions.*" The publication commences with an overview stating "*The police are the lead agency for collision investigation, and have the primary duty to investigate and establish the circumstances that have led to road deaths and life changing injuries. …*".

28. Under the heading "*Securing material and identifying witnesses*" the police manual states "***consider the forensic seizure of clothing and/or property (including mobile telephones) at an early stage.***"

29. Given the circumstances of the collision under review and based on my many years of experience, the mobile phone of Anne Sacoolas should have been the subject of a forensic examination.

30. Forensic analysis of the mobile phone was required to refute or support any such hypothesis that the mobile device was being used at the material time for talking, texting, emails, or any other function.

31. Similar to the screening test for alcohol, forensic analysis of the mobile phone would have assisted in establishing or negating a real and potential distraction to Anne Sacoolas immediately prior to the collision.

32. Mobile phone use whilst driving is a known and prevalent distraction in the United Kingdom and across the world in general. Any investigation in relation to phone usage would be reasonable and logical for the police investigators, and it appears to have formed part of their intended investigation plan.

33. When there is a fatality, the police will often inform the family of the deceased about the investigation. In this case, there is evidence that Harry Dunn's family were clearly seeking answers as to what may have contributed to the death of their son, including questions concerning Anne Sacoolas's use of her phone. On September 30, 2019, the police informed the family that an inquiry into the use of her phone was pending.

34. I have seen statements from Anne Sacoolas's counsel asserting that Anne Sacoolas offered the telephone to the police. I am not aware of any public or police records that would reflect this.

35. A full examination of the mobile phone would have been reasonably expected to have occurred in this case. Anne Sacoolas's departure from the United Kingdom with her phone precluded this.

I, Stuart Blackwood of ARC Investigations Limited, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.
Executed on 4 August 2021.

_____



Witness: Louise Hemingway
Number of witness statement: 1
Date: 27 February 2020
Exhibits: 1

## IN THE HIGH COURT OF JUSTICE
## QUEEN'S BENCH DIVISION
## ADMINISTRATIVE COURT

Claim No: CO/4688/2019

BETWEEN:

THE QUEEN, ON THE APPLICATION OF:

**CHARLOTTE CHARLES AND TIM DUNN**

**Claimants**

and

**SECRETARY OF STATE FOR FOREIGN AND COMMONWEALTH AFFAIRS**

**1st Defendant**

**CHIEF CONSTABLE OF THE NORTHAMPTONSHIRE POLICE**

**2nd Defendant**

## STATEMENT OF DETECTIVE INSPECTOR LOUISE HEMINGWAY

I, Detective Inspector Louise Hemingway of Northamptonshire Police, Wootton Hall, Northampton, NN4 0JQ will say as follows;

1. I make this statement in connection with judicial review proceedings brought by the Claimants.

2. The facts and matters to which I refer in this statement are either within my own knowledge, in which case they are true, or where I have otherwise stated the source of my information, they are true to the best of my knowledge and belief.

3. I am a Detective Inspector within the Serious Collision Investigation Unit.

4. On 27 August 2019 at about 20.29 a road traffic collision was reported to Northamptonshire Police. The collision involved a motorbike being ridden by Harry Dunn and a car being driven by Anne Sacoolas. Harry was taken to hospital but sadly later died of his injuries.

5. Police officers attended the scene. I was not one of these officers. Mrs Sacoolas was identified as a suspect by officers attending the scene and her identity and address details were taken and verified. Mrs Sacoolas was breathalysed at about 21:38 and the result was negative.

6. Mrs Sacoolas was not arrested on the night of the incident. This is not unusual and would have been subject to a risk assessment undertaken by officers at the scene. In order to be compliant with the law and in particular s24(4) and (5) of the Police and Criminal Evidence Act 1984 there must be a necessity to arrest. Officers will make decisions based upon the circumstances presented to them at the time, giving due consideration to risk factors in coming to a decision. Where a suspect is not arrested at the time of a collision, an investigation into the collision will take place and the suspect will later be asked to attend a police station for a voluntary interview.

7. That being said, my team always make early contact with the suspect and in this case arrangements were made to see Mrs Sacoolas the following day.

8. My role in the investigation that was to take place was as Senior Investigating Officer. The Officer in the Case was Detective Constable Rachel Pegg.

9. At 12.00 on 28 August 2019 DC Pegg and I attended Mrs Sacoolas' home address. Also present at this meeting was Jonathan Sacoolas, Hayley Hopkins who was employed by the US Airforce in a legal capacity and Daniel Fillebrown who told us that he was there representing the US Embassy and the US Department of State.

10. During this meeting a copy of Mrs Sacoolas' driving licence was taken and we explained to her what would happen next in terms of the criminal investigation. Mrs Sacoolas was told that she was a suspect and that the offence under investigation was Causing Death by Dangerous Driving. She was told that we

would be asking her to attend a voluntary interview at a police station in the coming weeks, after the initial part of the investigation had taken place.

11. In light of this DC Pegg asked if her she had any plans to leave the UK. Mrs Sacoolas advised DC Pegg and I that she did not have any plans to leave the UK. She explained that she and her family had been in the UK for a matter of weeks and that they would be in the UK for the next three years.

12. Nothing was mentioned during this meeting about diplomatic immunity. I was not aware of the nature of the business undertaken at RAF Croughton, and prior to this incident I had never previously dealt with personnel from the base.

13. None of the people present including Mrs Sacoolas or her husband spoke about the possibility of immunity.

14. Mrs Sacoolas seemed co-operative with our investigation.

15. At 13.55 on 28 August 2019 I received a call from the Head of Professional Standards of Thames Valley Police. He explained to me that he had received a call from Terry Couzens at the US Department of State regarding an incident involving the wife of a diplomat. The Thames Valley Police area closely borders the Northamptonshire Police area and it appears that it had been incorrectly assumed the incident had occurred within the Thames Valley Police boundaries. I agreed that my contact details could be passed on to Terry.

16. I received an email from Terry Couzens at 14.32 on the same day. This email made no mention of immunity. It asked for details about the next steps in terms of the investigation, the details of the Family Liaison Officer and whether or not a High-Ranking US Official could make contact with Harry's family to offer condolences.

17. Later that afternoon I was informed by DC Pegg that she had received a call from the Parliamentary and Diplomatic Protection Unit ("PaDP") of the Metropolitan Police Service, who had stated that Mrs Sacoolas had "Category C criminal diplomatic immunity" and that a waiver of this immunity would need to be applied for. The call was followed by an email confirming that Mrs Sacoolas had "Category C criminal diplomatic immunity".

18. I accepted this information as factual and was not aware of any other way I could determine if Anne Sacoolas had diplomatic immunity. The CPS guidance is clear that it is a matter for the police to establish if a person has diplomatic immunity and the procedural guidance also states that PaDP/FCO will provide information whether a suspect has diplomatic status. To me this meant that Mrs Sacoolas had criminal immunity and that the police could not do anything in terms of interviewing / charging her until a waiver of that immunity was granted.

19. This had no bearing on the conduct of the investigation and my team continued to gather evidence, undertake forensic collision investigation work, obtain witness accounts etc. The need for a waiver did not cause us to act any differently in this regard.

20. I did not consider at this point whether the information had come from the FCO specifically. I believed that the PaDP had access to a database which they had checked and which confirmed the position regarding immunity.

21. The relevant application forms for a waiver were provided by the PaDP, who also provided a suggested form of wording. They confirmed that the form should be returned to the 'PaDP Mailbox' email address. I completed the forms and I sent them to the Parliamentary and Diplomatic Protection Unit on the same day, copying DC Pegg.

22. I did not consider that there was a need to check or question the information that had been provided by the Parliamentary and Diplomatic Protection Unit. In policing it is common to rely on information held on Police systems such as the Police National Computer and my view was that this was accurate information provided by the Metropolitan Police Service. I did not know then nor do I know now of anywhere else that I could go and check the information.

23. At 13.37 on 30th August 2019 I called the PaDP to ask for an update on the waiver application, I spoke to Gareth Burnell who suggested that I have direct contact with the FCO. At 13.52 he emailed the FCO and shared an email I had sent to the PaDP at 12.51 which requested an update on likely timescales for a decision.

24. On 02 September 2019 I received an email from the FCO which stated *"following consultation with the US Embassy we are going to proceed with a formal request to the US Government to seek a waiver of the immunity held by Anne Sacoolas"*. I exhibit this email to this statement as LJH1.

25. I believed that this email from the FCO confirmed that the FCO took the view that Mrs Sacoolas had immunity – it said "...the immunity held by Anne Sacoolas..." - and a that waiver had to be applied for in order for the Police to interview her.

26. We had been advised by the PaDP that Mrs Sacoolas enjoyed criminal immunity, and I was not made aware of any restriction or limitation on the immunity. In view of this I believed there was no need to carry out further investigation. If I had been notified that there were limitations I would have made further enquiries with the PaDP to clarify what those limitations were in order to fully understand the implications for the investigation. We had also been informed by the PaDP that in order to interview Mrs Sacoolas it was necessary to obtain a waiver of immunity. The FCO had also stated that Mrs Sacoolas benefited from immunity and that a waiver of it was being applied for. I accepted the information from the PaDP and the FCO as being correct.

27. I should add that, on the basis of the conversations and communications referred to above, I had no reason to believe that the US would not grant a waiver of the immunity held by Mrs Sacoolas.

28. On 16 September 2019 I received a call from an FCO Protocol Official of the Foreign and Commonwealth Office at 16.39. She stated that the US Embassy had denied the request for a waiver and she informed me that Mrs Sacoolas had left the UK with her family and was back in the United States.

29. During that same telephone conversation I recall being advised that the FCO had been approached by Mrs Sacoolas to ask if there was any barrier to her leaving the UK a few days before she left.

30. Northamptonshire Police were not advised until after Mrs Sacoolas had left the UK about (i) the denial by the US of the FCO's application for a waiver of her immunity, or (ii) Mrs Sacoolas' approach to the FCO about leaving UK before she had in fact done so. Had I been aware of either of these matters, then I would have made an approach to the Crown Prosecution Service to discuss what, if anything, could be done. I would have wanted to consider any powers of arrest at that stage but my view is that diplomatic immunity would have been a barrier to any further Police action. In my mind at that time the immunity was absolutely clear in that it was immunity from arrest, detention, search and criminal prosecution. I have been involved in the extradition process previously and I know how difficult this can be and therefore I would have done all I could to avoid this.

31. I had not anticipated that the waiver would be declined, indeed during conversations with the FCO the opposite impression had been given due to the serious nature of the offence under investigation. I was completely taken aback about what had happened.

32. I requested email confirmation of the decision from the FCO and on 16 September 2019 an FCO Protocol Official emailed me to follow up on our conversation. She stated that the FCO were working with colleagues to gain agreement on the next steps. She asked that whilst this procedure was underway, over the next day or so, that the Police delay conveying the US decision to the Dunn family. She went on to say that whilst the Police may want to update the family quickly, it would help if the FCO could get their "ducks in a row" beforehand.

33. I was in agreement with this for a number of reasons. The first reason being that Anne Sacoolas had already left the UK, and telling the family straight away would not alter this fact. I also wanted to provide some answers to the inevitable questions and to properly manage their expectations. I was also mindful that Harry's funeral was to occur on the 18th September 2019 and I did not want to add to the distress of the family during this time by conveying such disappointing information. Furthermore I wanted to contact the CPS for advice on what options were now available and it seemed sensible to me to inform the family of the

decision once I had been updated by the FCO and CPS, and knew what these next steps would be so I could advise the family accordingly.

34. I met Harry's family on 26 September 2019 and explained the position to them and was able to answer their questions having taken advice from the CPS and FCO.

I believe that the contents of this witness statement are true

Signed ......... *L. Hemingway* ..........

Dated ......... 6th March 2020 ..........

**IN THE HIGH COURT OF JUSTICE**  
**QUEEN'S BENCH DIVISION**  
**ADMINISTRATIVE COURT**

Claim No: CO/4688/2019

**BETWEEN:**

**THE QUEEN, ON THE APPLICATION OF:**

**CHARLOTTE CHARLES AND TIM DUNN**

**Claimants**

and

**SECRETARY OF STATE FOR FOREIGN AND COMMONWEALTH AFFAIRS**

**1st Defendant**

**CHIEF CONSTABLE OF THE NORTHAMPTONSHIRE POLICE**

**2nd Defendant**

---

**EXHIBIT LJH/1**

---

This is the exhibit marked LJH/1 referred to in the witness statement of Louise Hemingway dated 06 March 2020.

**From:** FCO Protocol Official [█████████@fco.gov.uk]
**Sent:** 02 September 2019 10:04
**To:** Hemingway Louise <louise.hemingway@northants.pnn.police.uk>; Pegg Rachel <Rachel.Pegg@northants.pnn.police.uk>; Gareth.J.Burnell@met.police.uk
**Cc:** PaDPMailbox-.EmbassyLiaison@met.police.uk; PaDPMailbox-.2102Form@met.police.uk; Sunil.Antony@met.police.uk; Protocol DMIOU - Team 3 (Sensitive)█████████@fco.gov.uk>; █████████@fco.gov.uk>; █████████@fco.gov.uk>
**Subject:** Fatal RTC, Northamptonshire: waiver request

Dear All,

Following consultation with the US Embassy, we are going to proceed with a formal request to the US government to seek a waiver of the immunity held by Anne Sacoolas, as the suspect in this case; and the immunity held by Mr ████ and child ████ Sacoolas, to enable them to be interviewed as witnesses. I will draft the waiver request based on the language used in the 2102 forms, copied below for ease of reference:

- The Police intend to interview Anne under caution at a police station on suspicion of causing death by dangerous driving in order to provide her with an opportunity to provide an account of how the collision occurred.

- Northamptonshire Police wish to proceed with this investigation, therefore to enable police to interview Anne SACOOLAS, charge as necessary, attend court as a suspect and be sentenced, Police would like to apply for a waiver of Anne SACOOLAS's diplomatic immunity.

- Northamptonshire Police wish to interview Mr ████ SACOOLAS as a witness in this particular matter, therefore to enable police to interview ████ SACOOLAS and allow them to appear at court and give evidence if required to do so, police would like to apply for a waiver of ████ SACOOLAS's diplomatic immunity.

1

- Northamptonshire Police wish to interview [child] SACOOLAS as an eye witness in this particular matter, therefore to enable police to interview [child] SACOOLAS and allow them to appear at court and give evidence if required to do so, police would like to apply for a waiver of [child] SACOOLAS's diplomatic immunity.

With respect to the request for waiver of Anne SACOOLAS's immunity, grateful if you could confirm that we should include both elements above in the waiver request: ie request a waiver of immunity to allow an interview under caution and also to "charge as necessary, attend court as a suspect and be sentenced"? Similarly, please also confirm that we should seek a waiver for [Mr Sacoolas] and [child] to "allow them to appear at court and give evidence if required to do so", in addition to the request for them to be interviewed.

Many thanks indeed,

[redacted]

FCO Protocol Official

Room [redacted] | Foreign and Commonwealth Office | King Charles St | London | SW1A 2AH

Protocol Directorate

Lancaster House | GOV.UK/FCO | FCO YouTube | FCO Flickr | FCO on Twitter | FCO on Facebook




### Mr STUART BLACKWOOD MSc LCGI

A Consultant at ARC Investigations Limited. He specialises in collision reconstruction aspects, providing independent consultancy advice. He has extensive experience in dealing with and reporting road traffic collisions spanning over nearly 30 years. He served as a police officer for over 20 years with an unblemished conduct record and latterly was employed as a Principal Consultant at the UK's Transport Research Laboratory (TRL) for 7 years.

Stuart has attained a Master of Science degree with distinction in the subject of Forensic Collision Investigation and has carried out research studies reviewing the collision interaction of pedestrians and cyclists involved in side impact collisions with large vehicles. For his dissertation paper he also examined the potential benefits of fitting electronic sensor systems to the nearside of large vehicles and how the driver's blind areas could be reduced.

He holds the Licentiateship of the City and Guilds of London Institute in Traffic Accident Investigation.

Stuart has completed and holds a City and Guilds of London Institute certificate in Police Forensic Collision Investigation from Aberdeen University. He has Scottish Qualification Authority certificates in vehicle examination relating to all classes of vehicle and in the examination and calibration of both analogue and digital tachograph equipment. He holds a police advanced driving certificate, as well as being trained in security and protection evasive driving techniques. He holds a driving licence for large goods vehicles and motorcycles. Stuart is a certified National Cycle Instructor, providing cycling training and advice to both adults and children alike.

He has investigated and reconstructed collisions involving passenger carrying vehicles, large goods vehicles, cars, motorcycles, trams and bicycles, as well as both adult and child pedestrian fatalities. He has extensive knowledge and understanding relating to the investigation and reconstruction into a range of road death scenarios, including analysis of occupant movement and restraint systems.

Office: 0800 05 999 35    sb@arcinvestigations.co.uk
DD: 07890647566

Stuart has experience and certified training in forensic CCTV analysis and photogrammetry techniques. He has an excellent awareness of vehicles and has conducted analysis in both road traffic and crime cases with regards to vehicle identification. Stuart has experience in diagnostic equipment and is certified to collect and interpret data from Event Data Recorders. Stuart has experience of crash testing and data analysis on an international basis with him forming part of an international crash team for testing.

Stuart has experience in multi-agency investigations and has completed several joint enquiries with the Health and Safety Executive relating to incidents that have occurred off road, on business premises and in areas of designated road works.

He is experienced in the use of survey equipment and the production of associated plans, along with simulation and animation in reconstruction cases.

Stuart has also provided extensive international incident and investigation consultancy to a wide and varied range of organisations. In addition, he has provided consultancy advice to external agencies, providing crime scene analysis and associated vehicle assessments.

He is an experienced expert witness and has prepared written expert reconstruction reports and been recognised and commended by the Judiciary as an expert within his field. He has presented oral evidence in the Sheriff and High Courts during criminal trials, as well as the Court of Session in civil cases. He has also presented oral evidence in the Crown and County Courts in both civil and criminal cases. Stuart has also presented oral evidence as an expert witness in public Inquests.

He is listed on the United Kingdom expert witness register, having been vetted and accredited by legal Counsel in England and Scotland.